O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| FRED PIERCE, et al.; | SACV 01-0981 ABC (MLGx) |
| Plaintiffs, | CV 75-3075 ABC |
| v. | FINDINGS OF FACT AND CONCLUSIONS OF LAW |
| COUNTY OF ORANGE, et al.; | |
| Defendants. | |

Following remand from the Court of Appeals for the Ninth Circuit, the Court presided over a bench trial in this case held on February 9, 10, 16, and 17, 2010 and on March 23 and 24, 2010.  On May 7, 2010, the Court issued an Order resolving several preliminary issues before hearing closing arguments (Docket No. 731), which included requesting additional testimony that was offered on June 10, 2010.  The Court then heard closing arguments on June 23, 2010.  Finally, the parties filed their respective proposed findings of fact and conclusions of law pursuant to a stipulated briefing schedule which the Court approved (Docket No. 733): (1) Plaintiffs Timothy Conn, et al. ("Plaintiffs"), filed their proposed findings of fact and conclusions

of law on July 15, 2010 (Docket No. 742); (2) Defendant County of Orange (the "County") filed its proposed findings of fact and conclusions of law on August 5, 2010 (Docket No. 743); and (3) Plaintiffs filed their reply findings on August 26, 2010 (Docket No. 747).[1]

In section I of this opinion, the Court will set forth the procedural history of this case and resolve the parties' dispute over the scope of the class.  In section II, the Court will set forth its findings of fact; in section III, the Court will set forth its conclusions of law.  See Fed. R. Civ. P. 52(a)(1).  In section IV, the Court will issue its "ultimate" findings and, in section V, the Court will outline the injunctive relief necessary to remedy the violations of Title II of the Americans with Disabilities Act ("ADA").

## I.   PROCEDURAL HISTORY AND SCOPE OF ADA SUB-CLASS

### A.   Procedural History

The Ninth Circuit's opinion in this case sets forth the lengthy history of this case up to that point, and the Court recites it only as relevant to the Court's opinion at this stage.  See Pierce v. County of Orange, 526 F.3d 1190 (9th Cir. 2008).  Plaintiff Timothy Conn and several others filed this class action suit in 2001 pursuant to, inter alia, Title II of the ADA, 42 U.S.C. § 12131, et seq., "alleging non-compliant jail facilities and denial of access to programs and services available to non-disabled detainees."  Pierce, 526 F.3d at 1195.  Judge Taylor of this Court presided over a six-day

---

[1]On August 24, 2010, the County attempted to file a belated and unauthorized additional brief styled as "objections" to Plaintiffs' proposed findings, but the Court struck the brief as violating the Court's briefing schedule and has not considered the matters stated therein.  (Docket No. 746.)

1   court trial and rejected Plaintiffs' ADA claims.  Id.  Plaintiffs

2   appealed and the Ninth Circuit reversed and remanded for further

3   factfinding.  Id. at 1226.

4       In a separate Order, this Court concluded that, based on the

5   Ninth Circuit opinion, the following issues needed to be decided: (1)

6   whether barriers to access to facilities that currently house

7   mobility- and dexterity-impaired detainees exist and if so, what

8   remedial measures are necessary to assure ADA compliance; (2) whether,

9   when viewing the programs, services, and activities offered by the

10  County "in their entirety," mobility- and dexterity-impaired detainees

11  are "categorically excluded" from programs, activities, and services

12  offered to non-disabled detainees and inmates and, if so, what remedy

13  is necessary; and (3) whether Plaintiffs "were denied adequate notice

14  of their rights under the ADA and an appropriate grievance procedure,

15  as required by the regulations."  (Docket Nos. 730, 731.)  The Court

16  also concluded that "mainstreaming" disabled inmates with non-disabled

17  inmates at the Theo Lacy and Musick facilities was not an issue left

18  open by the Ninth Circuit's opinion.  (Docket No. 731 at 9—12.)

19      **B.   Scope of ADA Sub-Class**

20      The parties have raised and argued two issues regarding the scope

21  of the ADA sub-class represented by Plaintiff Conn: (1) that the class

22  is limited to pretrial detainees to the exclusion of sentenced

23  inmates; and (2) that the class is limited to detainees with Conn's

24  specific combination of disabilities, rather than detainees with any

25  "mobility" or "dexterity" impairment.  The Court concludes that the

26  class is limited to pretrial detainees, but that the class is not

27  limited to disabled detainees with Plaintiff Conn's specific

28  combination of impairments.

First, the class is properly defined as mobility- and dexterity-impaired pretrial detainees because the operative complaint, the Court's original class certification order, and the Ninth Circuit opinion all limited the sub-class represented by Conn to pretrial detainees.  For example, the operative Fifth Amended Complaint classified Plaintiff Conn and all other class representatives as pretrial detainees (Docket No. 375 ¶ 14) and the Court certified the class as composed of pretrial detainees, not sentenced inmates (Docket No. 169).  The Court granted class certification on October 15, 2003, which included a "sub-class" of "disabled detainees who had been denied rights under the ADA." Pierce, 526 F.3d at 1198.  Then on March 1, 2004, the Court decertified the damages class, but let stand the certification of the class for injunctive relief, including the ADA sub-class.  See id.  In that Order, the Court identified the class for injunctive relief as "all pre-trial detainees held in Orange County jails after October 21, 2001 who were denied various rights under Stewart and the ADA" (Docket No. 309 at 2) and explained that the class was "defined by a membership in a certain group of individuals (pre-trial detainees), during a specific time period (October 21, 2001 to the present), at a concentrated location (the Orange County jails), and having common claims (the denial of certain specific rights)" (Docket No. 309 at 18).

Moreover, the Ninth Circuit made clear in the portion of its opinion discussing class certification that the class was composed of a "main class" of pretrial detainees and an ADA "sub-class" of disabled detainees. Pierce, 526 F.3d at 1197—98.  While the Ninth Circuit referred to disabled "detainees" and "inmates" interchangeably, see Pierce, 526 F.3d at 1218, 1220—22, 1225—26, it

4

1  repeatedly defined the class as mobility- and dexterity-impaired "pre-
2  trial detainees," id. at 1214, 1217—1218 & nn.30, 32.

3      Even though Plaintiffs argue that equity supports expanding the
4  class definition to include disabled sentenced inmates, the Court is
5  not convinced that it should (or even could) amend the class
6  definition following remand to expand the class to encompass an
7  entirely new group of class members.  See Vizcaino v. U.S. Dist. Court
8  (In re Viscaino), 173 F.3d 713, 720—22, amended by 184 F.3d 1070 (9th
9  Cir. 1999).  Thus, the class is properly limited to pretrial
10 detainees.

11     However, the Court rejects the County's belated attempt to limit
12 the class to detainees with Plaintiff Conn's precise combination of
13 disabilities, rather than to detainees with either a "mobility" or
14 "dexterity" impairment.  On November 23, 2004, the Court limited
15 evidence related to the alleged ADA violations "to conditions
16 applicable to Plaintiff Conn and persons having a disability similar
17 to his." (Docket No. 484.)  The Ninth Circuit explained that this
18 clarified the scope of class membership by limiting ADA disability
19 evidence "to conditions applicable to Plaintiff Conn [a wheelchair-
20 bound named plaintiff] and persons having a disability similar to
21 his." Pierce, 526 F.3d at 1198 (brackets in original).  The court
22 further described Plaintiff Conn as "a paraplegic or incomplete
23 quardiplegic, meaning that he has no mobility in his lower body and
24 some, albeit limited, use of his upper body.  The parties agree that
25 the subclass consists of mobility- and dexterity-impaired inmates."
26 Id. at 1198 n.6 (emphasis added).

27     The law permits broadly defined classes of disabled individuals
28 to challenge accommodation policies, so long as the class

representatives suffer from the disability.  <u>See</u> <u>Armstrong v. Davis</u>, 275 F.3d 849, 868—69 (9th Cir. 2001).  In <u>Armstrong</u>, the court found claims for accommodations were common to a class even though the class members suffered from diverse disabilities such as hearing, vision and learning impairments, as well as developmental and mobility disabilities.  <u>Id.</u> at 868.  The court did, however, exclude class members suffering from kidney disabilities because no named plaintiff suffered from that disability.  <u>Id.</u> at 869.  Notably, one of the named plaintiffs representing prisoners with life sentences suffered from two disabilities (mental retardation and hearing impairment), <u>id.</u> at 855 n.1, yet the court did not suggest he would be limited to representing only life prisoners with that combination of disabilities.  In the end, "[w]hen determining what constitutes the same type of relief or the same kind of injury, we must be careful not to employ too narrow or technical an approach.  Rather, we must examine the questions realistically: we must reject the temptation to parse too finely, and consider instead the context of the inquiry."  <u>Id.</u> at 867.

Here, as in <u>Armstrong</u>, the class is not and has never been limited to detainees with Plaintiff Conn's particular combination of disabilities.  After reviewing the extensive briefing and Orders related to the scope of the class in this case,[2] it is clear that, until now, the parties have never disputed whether Plaintiff Conn could represent detainees with mobility <u>or</u> dexterity impairments;

---

[2]On September 7, 2010, the Court granted the County's unopposed ex parte application to lodge with the Court various briefs and orders in this case related to the scope of the class issue. (Docket No. 751.)

6

1  rather, the parties' disputes centered on whether Plaintiff Conn could
2  represent hearing- or vision-impaired inmates as part of the class.
3  (Docket Nos. 452, 462, 478.)   In fact, the Ninth Circuit suggested
4  that this was the nature of the parties' disagreement when it noted
5  that "[o]ur references to 'accessibility' — like those made by the
6  district court and the parties — are to be construed in terms of the
7  impairments of the sub-class of mobility- and dexterity-impaired
8  detainees.  Issues of accessibility for those with other impairments —
9  such as loss of hearing or sight — are not before us." Pierce, 526
10 F.3d at 1218 n.30.

11      This conclusion makes practical sense.  Plaintiff Conn can
12 properly represent most detainees with a dexterity or mobility
13 impairment because his dexterity impairment (severely clubbed hands)
14 and mobility impairment (confinement to a wheelchair) would require
15 modifications that would likely accommodate individuals with a broad
16 range of dexterity and mobility impairments.  This is precisely the
17 type of realistic examination compelled by Armstrong.  Thus, the class
18 is and has always been properly defined as all pretrial detainees
19 suffering from mobility or dexterity impairments similar to Plaintiff
20 Conn's.

21 **II.  FINDINGS OF FACT**

22      **A.  Overview of the Orange County Jail System**

23 1.  The Central Jail Complex in Santa Ana is comprised of the Intake
24      Release Center (the "IRC"), the Men's Central Jail (the "MCJ")
25      and the Women's Central Jail (the "WCJ").  The County jail system
26      also maintains facilities called James A. Musick ("Musick"),
27      which is commonly referred to as "the Farm," and Theo Lacy.

28 2.  The **MCJ** is a large multi-story building that houses approximately

1   1,500 male inmates and detainees of all security levels.  (Trial
2   Tr. 45:16—22.)

3.  The **WCJ** was closed in approximately May 2009 and was closed at
    the time of trial.  (Trial Tr. 645:6—11.)  The majority of women
    who had previously been housed at the WCJ were moved to the IRC.
    The remaining women were transferred to the Musick facility.
    (Trial Tr. 645:13—17.)

4.  At the **IRC**, all pretrial detainees, male and female, are
    processed into the jail system through the "Booking Loop."
    (Trial Tr. 188:21—189:17.)

5.  The IRC has five housing modules labeled J, K, L, M, and N.
    (Trial Tr. 645:21—646:1.)  At the time of trial, approximately
    150 female detainees and inmates of all security levels, were
    housed in Module K of the IRC.  The remainder of the modules were
    used to house male inmates and detainees.  (Trial Tr. 680:15—18.)

6.  All female class members are housed in the IRC, Module K, Sectors
    13 and 14.  (Trial Tr. 647:7—14, 705:12—24.)

7.  **Theo Lacy** is a large facility with the capacity to house 3,111
    male inmates and detainees, but between 2,600 and 2,700 men were
    housed there at the time of trial.  (Trial Tr. 458:19—24.)

8.  The Theo Lacy facility is comprised of the following: several low
    security dormitory-style housing units labeled Dorms A, B, C and
    D, referred to as "barracks," each of which houses 300
    individuals; areas labeled F, G, and H, called "pods," which
    house approximately 1,000 inmates or detainees and have large
    dayrooms with beds or cells on the outside edge of the open
    dayroom and toilet facilities opening onto the dayroom area; and
    units labeled Modules I through R, which are built around smaller

1     dayrooms where the inmates are housed in individual, double, or

2     four-man cells.  (Trial Tr. 110:2—111:6, 470:21—24, 479:1—5.)

3 9.   The construction of Module O, the medical unit for Theo Lacy, was

4     completed in 2001 or 2002.  Only inmates and detainees with

5     medical needs are housed there.  (Trial Tr. 459:21-460:4.)

6     Module O at Theo Lacy can house up to 120 inmates (it housed 80

7     inmates at the time of trial).  It consists of 36 one-person

8     cells and 18 four-person cells and an open ward area, Sector 37,

9     that can accommodate individuals without more serious medical

10     needs.  (Trial Tr. 464:4—465:7.)

11 10. **Musick** houses minimum security pretrial detainees and sentenced

12     inmates.  (Trial Tr. 513:25—514:7.)  At the time of trial, 353

13     male inmates and 94 female inmates were housed at Musick.  (Trial

14     Tr. 195:23—196:10, 516:1—9.)

15 11. Musick is seventeen miles from the Central Jail Complex.  (Trial

16     Tr. 859:13—19.)

17   **B.**   **Modifications Between 2004 and 2010**

18 12. Since the original trial in this case in 2004, the County has

19     made very few modifications to its facilities.  (Trial Tr.

20     877:20—881:6, 886:14—889:19; Trial Ex. 38.)

21 13. The County has also conducted no analysis to determine how costly

22     the necessary modifications might be.  (Trial Tr. 929:11—930:4.)

23 14. In fact, one purpose of Plaintiffs' expert's tour of the jail

24     facilities in 2009 was to re-inspect areas that Plaintiffs'

25     former expert had inspected in 2004, and Plaintiffs' current

26     expert confirmed that, "except for possibly one or two

27     exceptions," the previously identified physical barriers

28     persisted.  (Trial Tr. 41:25—42:15.)

C.   **Physical Barriers at the MCJ**

i.   **Wards C and D and Sheltered Living of Module O**

15. Male detainees with mobility or dexterity impairments in the MCJ
are housed exclusively in Module O,[3] which consists of a medium-
sized room called "Ward C" and a similarly sized room called
"Ward D," both of which have a toilet and shower area inside the
room and an attached dayroom.  Down the hallway from Wards C and
D are 18 one- or two-person cells in an area called "Sheltered
Living."  Off the same hallway is a small room called the
Sheltered Living dayroom, which contains a restroom and shower.
(Trial Tr. 45:23—46:16.)

16. The jail assigns to Ward C all detainees with the following
conditions: 1) frequent or recent onset of seizures; 2) diabetes
under poor control, which often can involve neuropathy of the
legs or feet; 3) head injuries requiring neurological checks; 4)
acute medical problems; and 5) conditions that require the use of
wheelchairs.  (Trial Tr. 708:9—709:18.)

17. Male detainees who require the use of wheelchairs can also be
assigned to Ward D, including those who are paraplegic and
quadriplegic, and those who have advanced mobility problems.
(Trial Tr. 60:12—23, 710:1-712:17, 714:9-715:18.)  In addition,
the County houses individuals with severe diabetes and orthopedic
cases in Ward D.  (Trial Tr. 712:18-713:11.)

18. Male detainees who are required to use canes, crutches, walkers,
or who have leg casts or metal splints, as well as those with
back injuries requiring bed rest, and the hearing and visually

---

[3]Confusingly, a "Module O" exists at both the MCJ and Theo Lacy.

1    disabled, are all housed in the Sheltered Living cells, along

2    with overflow inmates and detainees in wheelchairs from Wards C

3    and D who can transfer themselves and do not require continuous

4    medical care. (Trial Tr. 709:9—710:10, 713:14-23.)

5  19.  During Plaintiff Conn's most recent incarceration in 2009, there

6    were usually approximately 14 inmates housed in Ward C;

7    typically, two or three of them were wheelchair-bound inmates.

8    (Trial Tr. 596:5—13.)

9          a.  Ward C Shower and Toilet

10  20.  Plaintiffs' expert in 2004, Peter Robertson, identified at least

11    ten barriers in Ward C. (Trial Ex. 5 at 12—14.) The Ninth

12    Circuit credited those findings. Pierce, 526 F.3d at 1217—18.

13  21.  Plaintiffs' current expert, Logan Hopper, verified that the

14    barriers in Ward C identified by Robertson still existed at the

15    time he toured the facility in 2009. (Trial Tr. 46:17—48:11;

16    Trial Ex. 4 at 71, 73.)

17  22.  The shower in Ward C contains at least five separate barriers: a

18    thirteen-inch high curb that prevents someone in a wheelchair or

19    with a significant mobility impairment from entering the shower;

20    no grab bars; improper shower controls; improper shower head; and

21    no fixed shower seat. (Trial Tr. 48:12—50:11; Trial Ex. 4 at 69;

22    Trial Ex. 5 at 14.)

23  23.  Because of the high curb, Plaintiff Conn, an incomplete

24    quadriplegic, experienced difficulty using the shower during his

25    recent incarceration in July 2009. (Trial Tr. 590:9—593:4.)

26    Indeed, no wheelchair-bound inmate or detainee could get into the

27    shower without assistance. (Trial Tr. 751:1—10.)

28  24.  As a result, to take a shower, Plaintiff Conn had to ask two

1 other inmates in Ward C to lift him and his wheelchair over the

2 concrete barrier and into the shower, while a third inmate would

3 have to stand next to him to make sure he was not dropped.

4 (Trial Tr. 593:19—25.)  He had to hand his jumpsuit to someone

5 outside the shower, and when he was done, Plaintiff Conn had to

6 ask other inmates to return and lift him (naked) out of the

7 shower.  (Trial Tr. 594:4—7.)  Plaintiff Conn and his wheelchair

8 weigh a total of 190 to 195 pounds.  (Trial Tr. 596:1—4.)

9 25. Conn explained that he had to shower in his own wheelchair

10 because an unattached plastic bench was too unstable for him to

11 use and he feared it would collapse in the shower if he used it.

12 (Trial Tr. 593:13—594:4.)  Using a plastic shower seat in this

13 way is "hazardous" and does not comply with ADAAG or CalDAG

14 guidelines.[4]  (Trial Tr. 49:6—50:11, 1136:13—17.)

15 26. During his incarceration in 2009, Plaintiff Conn personally

16 observed inmates helping other wheelchair-bound inmates get into

17 the shower several times, but never observed nurses or officers

18 assisting inmates.  (Trial Tr. 596:14—24.)  The County's witness

19 on jail construction, Ron Bihner, confirmed that, on the tour he

20 took of Ward C in 2004, he saw a wheelchair-bound inmate being

21 lifted over the curb by other inmates, and observed no guard,

22 nurse, or other medical personnel assisting the inmate.  (Trial

23

24  [4]Throughout these findings, the Court will refer to "ADAAG,"
25 "UFAS," and "CalDAG" guidelines.  ADAAG stands for the Americans with
Disabilities Act Accessibility Guidelines for Buildings and Facilities
26 ("ADAAG"), 28 C.F.R. Pt. 36, App. A.  UFAS is an acronym for the
Uniform Federal Accessibility Standards, 41 C.F.R. Pt. 101-19.6, App.
27 A.  And "CalDAG" refers to the California Disabled Accessibility
Guidebook, which is an "interpretive manual" authored by Michael P.
28 Gibbens, the County's testifying ADA expert.

1   Tr. 1004:16—1005:4.)

2   27.  This arrangement poses serious physical risks to all those

3   involved.  (Trial Tr. 50:12—52:12, 1005:5—12.)  In fact, Nurse

4   Nancy Redler, the County's witness on medical issues, testified

5   that California regulations prohibit inmates from lifting

6   disabled inmates into the shower because it is considered a form

7   of providing medical care.  (Trial Tr. 718:23—720:9.)  Indeed,

8   only someone with specialized training should lift a quadriplegic

9   to use a toilet or shower.  (Trial Tr. 761:25—763:6.)

10  28.  Beyond the risk of physical injury posed by inmates helping

11  disabled inmates over the curb and into the shower in Ward C,

12  this arrangement creates a risk that disabled inmates may become

13  beholden to other inmates who might exploit that dependence; it

14  also undermines the independence encouraged by the ADA.  (Trial

15  Tr. 248:3—249:24.)

16  29.  Reasonable accommodations exist to make the Ward C shower

17  accessible for approximately $5,000 by removing the curb,

18  installing grab bars, lowering the shower controls, and

19  installing an accessible shower head and fixed shower seat.

20  (Trial Tr. 52:13—55:11.)

21  30.  The Ward C toilet has an improper discontinuous grab bar; the

22  flush valve is too high; and the toilet has an inadequate

23  clearance from the wall.  (Trial Tr. 597:20—598:4; Trial Ex. 4 at

24  68.)  Dexterity- and mobility-impaired detainees could experience

25  difficulty using the toilet with these conditions.  (Trial Tr.

26  55:12—57:19.)

27  31.  The cost to bring the flush value and grab bar into ADA

28  compliance is estimated to be $200—$300.  (Trial Tr. 57:1—19.)

13

1    Although the County's construction witness, Ron Bihner, testified

2    that moving the flush valve to install a 36-inch continuous grab

3    bar as called for by the CalDAG guidelines (Trial Ex. 138 at 274)

4    would cost $1,500 (Trial Tr. 937:3—938:13), he admitted that the

5    CalDAG guidelines nowhere permitted a discontinuous grab bar

6    (Trial Tr. 1001:3—16).  The Court credits Plaintiffs' evidence on

7    this point and finds that the cost for these modifications would

8    be in the $200 to $300 range and that they are necessary to make

9    the toilet accessible.

10   32.  The side grab bar by the Ward C toilet also did not extend the

11   necessary 54 inches.  (Trial Tr. 1134:7—1135:3.)  However, there

12   was no evidence on the cost of installing a new 54-inch grab bar,

13   although it would probably be encompassed within the $200-$300

14   estimate for installing a flush valve and continuous grab bar.

15   <center>b.   Ward D Shower, Toilets, and Sinks</center>

16   33.  In 2004, Robertson identified multiple physical barriers in Ward

17   D.  (Trial Ex. 5 at 12.)  As it did with Ward C, the Ninth

18   Circuit credited those findings.  Pierce, 526 F.3d at 1217—18.

19   34.  Hopper confirmed that Ward D has not been modified since the

20   inspection in 2004 and that it continues to present numerous

21   separate barriers to individuals with disabilities.  (Trial Tr.

22   60:3—62:14; Trial Ex. 4 at 78—80.)

23   35.  For example, the shower in Ward D remains inaccessible for the

24   same reasons as the shower in Ward C: a 13-inch curb, no grab

25   bars, no fixed seat, and improper controls and shower spray.

26   (Trial Tr. 62:15—65:3.)

27   36.  As with Ward C, reasonable modifications exist to make the Ward D

28   shower accessible for approximately $5,000.  (Trial Tr.

<center>14</center>

1   62:15—64:11.)

2   37.   The toilets in Ward D have not been modified in any way to make

3        them accessible to individuals with mobility or dexterity

4        impairments: they have no grab bars; the flush valves are too

5        high; and the adjacent urinals may need to be moved.  (Trial Tr.

6        64:18—65:23; Trial Ex. 4 at 76.)  The cost for grab bars and

7        lowering the flush valves would be a few hundred dollars.  (Trial

8        Tr. 65:24—66:2.)

9   38.   Likewise, none of the sinks in Ward D have been modified to make

10       them accessible to individuals with mobility or dexterity

11       impairments: they do not provide enough leg room; the water flow

12       buttons are difficult to operate for anyone with manual dexterity

13       impairments; and the mirror is too high for someone in a

14       wheelchair to use.  (Trial Tr. 66:3—67:16; Trial Ex. 4 at 74.)

15       The cost to install one fully accessible sink and faucet would be

16       roughly $1,000, assuming no major plumbing alterations are

17       necessary.  (Trial Tr. 67:17—68:13.)

18              c.   Sheltered Living Area and Dayroom

19   39.   The Sheltered Living area contains a twelve-foot-by-twelve-foot

20       dayroom where there is a phone, table, television, and shower.

21       (Trial Tr. 69:10—71:16; Trial Ex. 4 at 93—96.)

22   40.   The Sheltered Living dayroom's shower is near Wards C and D and

23       Plaintiff Conn's cell was located across from it when he was

24       incarcerated in 2002.  (Trial Tr. 625:15—626:16.)

25   41.   Robertson inspected the Sheltered Living dayroom in 2004 and

26       found several barriers to accessibility, although he noted that

27       the shower has some accessible features.  (Trial Tr. 71:17—72:11;

28       Trial Ex. 4 at 95; Trial Ex. 5 at 12—13.)  As of the 2009

1      inspection, the shower still contained improperly placed grab

2      bars and improper faucets. (Trial Tr. 72:12—24.) Those

3      shortcomings could be fixed for around $1,000. (Trial Tr.

4      74:12—76:1.)

5  42.  Similarly, the toilet in the Sheltered Living dayroom contains a

6      flush valve that is too high and, as of the 2009 inspection, the

7      distance between grab bars was excessive. (Trial Tr. 76:7—77:2;

8      Trial Ex. 4 at 96.) However, after the 2009 inspection, fully

9      accessible grab bars were installed. (Trial Tr. 1002:9—1003:9.)

10     Lowering the flush valve could cost around $1,000, depending on

11     the plumbing work needed. (Trial Tr. 77:3—15.)

12  43.  Consistent with its condition during both the 2004 and 2009

13     inspections, the sink in the Sheltered Living dayroom is not

14     accessible to individuals with mobility and dexterity impairments

15     because it does not have adequate knee space and the faucets are

16     not usable by individuals with dexterity impairments. (Trial Tr.

17     77:16—78:10.) The cost to replace the lavatory would be similar

18     to the cost to replace the sink in Ward D, approximately $1,000.

19     (Trial Tr. 78:7—10.)

20  44.  Three of the Sheltered Living cells have been modified to make

21     them "usable" for individuals with disabilities, but they are

22     still not fully compliant with ADAAG and UFAS guidelines because

23     the grab bars are three inches too short and the sink is too low.

24     (Trial Tr. 80:7—82:1.) The cost of extending the grab bar by

25     three inches and replacing the sink is estimated to be

26     approximately $1,100. (Trial Tr. 82:2—7.)

27

28

>     d.   No Accommodation by Transporting Detainees to
>          Sheltered Living Shower

45.   The existence of inaccessible showers in Ward C and D cannot be remedied by transporting disabled detainees to the Sheltered Living shower. As noted above, the Sheltered Living shower is not fully accessible. Even if that shower is brought into compliance, the evidence does not demonstrate that inmates would be taken to the Sheltered Living shower as an accommodation: Plaintiff Conn asked to be taken to the Sheltered Living shower several times while he was housed in Ward C, but deputies only took him to use that shower on one occasion during his month-long incarceration. (Trial Tr. 597:20—598:4.)

>     e.   Number of Accessible Cells

46.   Given that all men with mobility and dexterity impairments in the MCJ are housed in either Ward C, Ward D, or Sheltered Living, three accessible cells in Sheltered Living is an insufficient number to accommodate disabled detainees, according to ADAAG Guidelines, which require two percent of cells of a similar type to be ADA compliant. (Trial Tr. 82:8—84:22.) Indeed, a wheelchair was observed in one of the non-accessible cells in Sheltered Living. (Trial Tr. 82:22—25.) However, the evidence is insufficient to demonstrate how many more accessible cells are necessary to comply with ADAAG Guidelines (Trial Tr. 82:8—84:22), so the County is ordered to provide Plaintiffs' counsel and the Court with the number of total cells in order to determine the two-percent figure. This must be included in the plan which the Court has ordered. See Section V, Injunctive Relief, infra.

17

### ii.  Rooftop Recreation Area

47.  The MCJ has one outdoor exercise area on the rooftop for all inmates housed in that facility, which includes basketball hoops, several phones, and a drinking fountain.  (Trial Tr. 86:2—24.)

48.  In the general exercise area, there is a restroom up a flight of stairs.  (Trial Tr. 86:2-87:13; Trial Ex. 4 at 86.)

49.  Robertson inspected the rooftop exercise area in 2004 and identified numerous barriers to accessibility, none of which had been modified as of the 2009 inspection: a two-inch high concrete curb near the elevator leading to the roof; inaccessible toilets and sinks up a flight of stairs; a ramp leading to the main exercise area that was too steep and lacked a handrail on one side and lip protection on the other; and phones on the roof that were not mounted at the appropriate height for someone in a wheelchair.  (Trial Tr. 87:14—94:20, 99:8—100:24, 102:4—104:9; Trial Ex. 4 at 81, 82, 86, 87, 89; Trial Ex. 5 at 11.)

50.  Due to security concerns, the rooftop bathroom has been closed to all inmates, disabled or not.  (Trial Tr. 935:14—23, 1017:4—17.)

51.  If the bathroom is reopened, the cost of installing a lift near the restroom to bypass the flight of stairs would be between $25,000 and $50,000.  (Trial Tr. 97:6—19.)

52.  If a lift is installed, the cost of modifying the restroom area by installing one accessible sink and faucet and one accessible toilet would be around $4,000 to $5,000.  (Trial Tr. 97:20—98:7.)

53.  As an alternative to the lift, installing a new bathroom facility next to the existing bathroom but at the level of the roof would cost $25,000 to $50,000.  (Trial Tr. 98:10—99:7.)

54.  Allowing non-Administrative Segregation disabled detainees to use

the accessible bathroom in the Administrative Segregation portion of the roof would be impractical for administrative and security reasons.  (Trial Tr. 1018:15—1020:23.)

55.  One phone on the roof would need to be lowered to 48 inches to allow a front approach, which would cost $100 to $200, although this modification is admittedly low priority because an inmate in a wheelchair could use the phone by approaching it from the side when no one else is using the surrounding phones.  (Trial Tr. 102:18—103:20.)

56.  The concrete curb near the elevator could be physically modified to add a gradual beveled edge to allow a wheelchair to negotiate the curb, while also providing the needed barrier to prevent flooding in the elevator, although no evidence of cost was offered.  (Trial Tr. 88:5—89:23.)  As an alternative to a physical modification, the County could ensure that a trained deputy is available to "guide a wheelchair over the curb."  Pierce, 526 F.3d at 1219.  As the Ninth Circuit recognized, the prior record in this case demonstrated that "deputies, in fact, do this, and plaintiffs are not denied access to the rooftop or other locations because of these surface irregularities."  Pierce, 526 F.3d at 1219.

57.  A handrail is needed along both sides of the ramp (not just on one side, as exists now) at a cost of between $1,000 and $5,000.  (Trial Tr. 101:19—21, 927:1—19.)

58.  Likewise, a metal lip along the edge of the ramp is needed to prevent detainees in wheelchairs from rolling off; that would cost from a few hundred dollars up to $1,500.  (Trial Tr. 101:22—102:3, 927:1—19; Trial Ex. 138 at 177.)

59. The cost to resurface and extend the ramp to provide a more gradual slope would be $8,000 to $10,000. (Trial Tr. 101:1—18.)

60. Unlike the curb on the roof, the County offered no evidence that having a trained deputy guide wheelchair-bound detainees down the existing ramp would render the ramp accessible without having to make these necessary physical modifications. (Trial Tr. 382:16—25.)

### D.   Physical Barriers at the IRC

#### i.   The "Booking Loop"

61. All detainees, whether male or female, are processed into the jail through the "Booking Loop" at the IRC. (Trial Tr. 188:21-189:17.)  There are fifteen male holding cells and twelve female holdings cells. (Trial Tr. 189:18-24.)

62. One cell on the male side of the booking loop and one cell on the female side of the loop have been modified to be accessible to individuals with mobility and dexterity impairments. (Trial Tr. 190:22—192:1, 919:25-10.)

63. There are twenty-four male and ten female court transfer cells used to hold inmates/detainees as they are being processed to and from court. (Trial Tr. 190:2—6.)

64. Although detainees are placed in court transfer cells when going to and from court, those cells have not been modified to be made accessible for individuals with mobility and dexterity impairments. (Trial Tr. 192:2—9, 920:11—21.)  Those cells are large enough to be made accessible through the same types of modifications made to the booking loop cells, at a cost of less than $10,000. (Trial Tr. 920:11—24.)

65. The jail also has approximately ten pending release cells, none

1    of which has been made accessible.  (Trial Tr. 190:7—192:9.)

2  66.  One each of the specialized court transfer and pending release

3    cells could be made accessible under the ADAAG Guidelines.

4    (Trial Tr. 192:10—19.)  The costs of modifying one of these cells

5    is no more than several thousand dollars where some modifications

6    have already been made; where no modifications of any kind have

7    been made, the cost would be approximately $7,000 to $8,000,

8    which is consistent with the County's previous estimates.  (Trial

9    Tr. 192:10—194:3, 426:17—428:16; Trial Ex. 6 at 110 (2000 County

10    Transition Plan).)

11  67.  The counters used by staff and detainees in the booking loop to

12    obtain and record information about each detainee are too high.

13    (Trial Tr. 194:7-17.)  To attempt to accommodate detainees in

14    wheelchairs, nurses historically use a microphone to speak to

15    them through a sheet of plexiglass; sometimes the nurses come out

16    from behind the glass to triage the detainees.  (Trial Tr.

17    739:8—741:3.)  Those efforts ameliorate, but do not solve, the

18    accessibility problem of counter height.

19  68.  Five percent of the counters in the booking loop could be lowered

20    to make them accessible to people with disabilities and to comply

21    with ADAAG's requirements, at the cost of $4,000 per counter.

22    (Trial Tr. 194:18—195:22.)  The evidence is insufficient,

23    however, to determine how many actual counters would need to be

24    altered, so the County is ordered to provide Plaintiffs' counsel

25    and the Court with the number of total counters in order to

26    determine the five-percent figure.  This must be included in the

27    plan which the Court has ordered.  See Section V, Injunctive

28    Relief, infra.

### ii.  Module K, Sectors 13 and 14

69. Sectors 13 and 14 of Module K in the IRC (where all women with disabilities in the Orange County Jail system are currently housed) have not been modified in any way to make them accessible to individuals with mobility or dexterity impairments.  (Peterson Dep. Tr. 21:3—18; Trial Tr. 173:1—6, 177:4—7, 678:5—15, 706:1—7.)

70. Each of the sectors in Module K is comprised of a large dayroom surrounded by two floors of cells.  (Trial Tr. 173:10—175:4; Trial Ex. 4 at 10.)  The cells and rooms on the second floor of Sectors 13 and 14 are completely inaccessible to individuals with mobility and dexterity impairments, as they are reached by a flight of stairs.  (Trial Tr. 176:13—177:3; Trial Ex. 4 at 11—12.)

71. Modules L and M have the same configuration.  (Trial Tr. 173:10—18.)

72. The dayroom serving Sectors 13 and 14 has numerous inaccessible features, including phones that are mounted too high (UFAS and ADAAG guidelines provide that they can only be 48 inches from the floor) and tables that have fixed seats, which prohibit a person in a wheelchair from being able to roll up to the table.  (Trial Tr. 175:2—176:3.)  Lowering one phone would cost approximately $100 and the tables can be modified simply by removing one of the fixed seats.  (Trial Tr. 175:2—176:12.)

73. The female inmates housed in Sectors 13 and 14 have access to a shower in the dayroom, which is a free-standing prefabricated shower in a metal stall.  (Trial Tr. 178:12—179:5; Trial Ex. 4 at 21 (showing substantially similar shower in Module M).)  The shower has multiple features rendering it inaccessible, such as a

22

narrow 34-inch access and the absence of grab bars, accessible
controls, or modified shower spray. (Trial Tr. 178:12—179:18,
1135:4—1136:17; Trial Ex. 4 at 21.)

74. The County could entirely replace the inaccessible pre-fab shower
in the dayroom with an accessible model, which has a larger
entry, grab bars, accessible controls, and a built-in showerhead,
at a cost of approximately $10,000 for materials and
approximately $1,000 for installation if the plumbing "lined up,"
or up to a maximum of $10,000 for installation if plumbing
alterations are necessary. (Trial Tr. 179:19—180:21.)

75. Alternative permissible alterations include adding a fold-down
seat, grab bars, a removable hand spray shower head, and controls
that do not require too much force, and using an ADA-approved
shower unit with the proper height. (Trial Tr. 889:19—25.)
Assuming that the shower stall does not need to be enlarged and a
curb does not need to be removed, the approximate cost of such
modifications would be $4,000 to $5,000. (Trial Tr. 890:1—22.)

76. The dayroom is also equipped with a free-standing toilet and
stall, but it, too, is inaccessible for individuals with
disabilities because the clearance is too narrow (34 inches) and
the toilet/sink combination is too small. (Trial Tr.
180:22—181:13; Trial Ex. 4 at 20 (showing substantially similar
toilet in Module M).)

77. It could be replaced with an accessible model and privacy
partition for a cost of $15,000. (Trial Tr. 180:22-183:3.)

78. Neither guards nor inmates assist wheelchair-bound female inmates
in physically using the shower or toilet facilities in Module K.
(Trial Tr. 649:12—16.) The only nurse on duty in Sectors 13 and

14 also does not — and cannot — assist disabled detainees and inmates with personal care, such as transferring into and out of the shower and on and off the toilet. (Trial Tr. 706:25—708:2, 718:23—719:24.)

79. The only accommodation offered to disabled female detainees in Module K for the shower and toilet is to make available to them a single plastic shower chair (which is a piece of equipment similar to or shaped like a walker but featuring a seat in between two handles), and two plastic toilet seats to be moved between the cells by the guards. (Trial Tr. 648:23—649:11, 678:16—679:12.) Those measures are not acceptable accommodations because they pose a hazard; rather, a "built-in, solid structural apparatus" is necessary to use the toilet safely and a fixed seat is required to transfer properly into and out of the shower. (Trial Tr. 162:17—164:20, 1129:3—1131:18.)

80. If a disabled detainee or inmate is unable to transfer into the shower chair without assistance from a deputy, a deputy escorts the inmate to the WCJ, a distance of 900 yards. (Trial Tr. 648:23—649:11, 682:24—683:2.)

81. The only visitor area available to inmates in Module K is up a flight of stairs and completely inaccessible to individuals with mobility impairments. (Trial Tr. 922:7—11.) As with using the accessible showers, individuals with mobility impairments must be escorted 900 yards to the WCJ to have any of their visits. (Trial Tr. 667:24—669:8, 682:24—683:6.)

82. No cells in Module K have been made accessible, although all of the County's disabled female detainees are housed there. (Trial Tr. 886:9—13.)

83. Making a cell accessible in Module K would cost approximately
    $5,500, the same cost for modifying cells in Module L that
    already have been renovated by the County (discussed below).
    (Trial Tr. 885:1—886:8.)

84. Moreover, consistent with the ADAAG requirement that two percent
    of all common-use cells be accessible, approximately ten cells
    would have to be made accessible in Module K, given the overall
    population of female detainees and the fact that all disabled
    female detainees are housed in this area. (Trial Tr.
    177:24—178:11.)

    **iii. Exercise Area**

85. The only exercise area for female detainees with disabilities in
    the entire Orange County jail system is a room located adjacent
    to Sector K in the IRC, equipped with a single basketball hoop
    and several chairs. (Trial Tr. 184:10—185:18; Trial Ex. 4 at 19
    (showing recreation area in substantially similar Module M).)

86. The toilet and sink in the recreation area are not accessible:
    the toilet does not have sufficient room for transfer; there are
    no grab bars; the flush valve is too high; and the sink has a
    front piece that descends too far to allow a wheelchair user to
    approach it properly. (Trial Tr. 185:18-186:6.) Modifications
    would cost in the range of $7,000 to $8,000 because a concrete
    wall would have to be moved. (Trial Tr. 186:7—17.)

    **iv. Module L**

87. The IRC also has a specialized unit called Module L that provides
    around-the-clock mental health services to mentally ill male
    inmates. (Trial Tr. 186:18—187:7.) Because dexterity- and
    mobility-impaired detainees may also use this area, it must be

1    made accessible.

2  88.  Module L in the IRC has one accessible cell out of twenty-four,

3       which was modified in 2004 to comply with the ADA.  (Peterson

4       Dep. Tr. 21:19—23:14.)

5  89.  In November 2004, the County installed grab bars and an "ADA

6       compliant toilet/sink combination" in one cell in Module L at a

7       cost of just under $5,500 (including installation and plumbing).

8       (Trial Tr. 882:7—884:17; Trial Ex. 134.)

9  90.  The dayroom area's shower, bathroom, phone, and tables, the

10      recreation area's toilet and sink, and the visiting area on the

11      second floor are identical to those in Module K and are

12      inaccessible in the same ways as those areas in Module K.  (Trial

13      Tr. 187:8—188:7.)  The costs to modify these areas would be the

14      same as the costs to modify the same areas in Module K.  (Trial

15      Tr. 188:3—20.)

16 91.  The evidence does not demonstrate that an ADA-compliant toilet-

17      sink combination unit in a cell poses a suicide or hanging threat

18      to mentally ill inmates in Module L; one such unit was installed

19      there in November 2004 at the County's direction.  (Trial Tr.

20      884:21—25.)

21     **E.    Physical Barriers at the WCJ**

22 92.  The County is not currently housing any female detainees or

23      inmates in the WCJ, but disabled female detainees use a portion

24      of the WCJ and it could be reopened to house disabled female

25      detainees.  (Trial Tr. 157:13—158:22.)

26 93.  In his 2004 inspection, Robertson noted barriers to accessibility

27      in the two areas where women with disabilities were then being

28      housed: the Infirmary and the Sheltered Living area.  (Trial Tr.

158:25-159:22; Trial Ex. 5 at 8.)    None of those barriers had
been corrected as of the 2009 inspection.  (Trial Tr. 159:20–
162:23; Trial Ex. 4 at 135.)

94.  In the Infirmary dayroom, the toilet/sink combination unit and
the hot water dispenser are inaccessible and impossible for a
person with a disability to use.  (Trial Tr. 159:23–162:16,
996:6–12, 1001:17–1002:8; Trial Ex. 4 at 135.)  There is no
evidence that the room is too small to accommodate an accessible
toilet and sink.

95.  When housed in that area, female detainees with disabilities were
required to summon a deputy to ask to be unlocked from and taken
out of the dayroom and moved back to their locked cell in order
to use a toilet, and thereafter to be returned through the same
set of locked doors to complete their time in the dayroom.  Non-
disabled detainees and inmates could use the toilet in the
dayroom without assistance.  (Trial Tr. 996:13–998:2.)

96.  There is an accessible toilet inside a cell three feet away from
the toilet in the dayroom.  (Trial Tr. 962:21–963:7.)  However,
the cell presumably would house one or two disabled inmates, so
that toilet could not be used at any time by any wheelchair-bound
detainee housed elsewhere and using the dayroom.  (Trial Tr.
963:1–7.)

97.  The toilet and sink area in the Infirmary dayroom could be
modified to be made accessible through installation of an
accessible toilet/sink unit, similar to modifications at the MCJ,
but this alteration would also require removal of a concrete
barrier at additional expense.  (Trial Tr. 161:25–162:16.)

98.  The shower in the Infirmary — referred to as the "handicap

27

shower" — is still being used by disabled female detaineees who
are not able to use the plastic shower stool in Module K at the
IRC.  (Trial Tr. 167:4—24; Trial Ex. 4 at 143.)

99.  This shower is not fully accessible because the door is only 26
and 1/2 inches wide; the mirror and shower spray are mounted too
high; and the grab bar is not properly placed.  (Trial Tr.
167:4—169:13; Trial Ex. 4 at 143.)

100.  Particularly, the width of the door is improper.  Although it
might permit entry for a small wheelchair (20 inches), larger
wheelchairs would not fit.  ADAAG and UFAS Guidelines require an
opening of at least 32 inches to accommodate different-sized
wheelchairs.  (Trial Tr. 170:9—171:2.)  If an inmate can access
the shower, however, the shower spray has an accessible hose
attachment.  (Trial Tr. 960:3—961:4.)

101.  The Infirmary shower could be made fully accessible for as little
as $10,000 ($5,000 for modifying grab bars and shower controls
and a few thousand dollars to widen the doorway), but could cost
as much as $25,000 if significant alterations to the doorway were
necessary.  (Trial Tr. 169:14—170:8.)

102.  The shower in the Sheltered Living area has a curb, has no
interior seat, and has improperly installed grab bars and
improper controls, all of which pose safety hazards to
individuals with disabilities.  (Trial Tr. 164:21—166:20; Trial
Ex. 4 at 136.)

103.  When notified that a mirror in the Sheltered Living shower was
too high, jail personnel removed the mirror instead of lowering
it, even though lowering it would not have taken much time or
expense.  (Trial Tr. 995:7—996:5.)

104. The rooftop exercise area of the WCJ has restroom facilities that
     are inaccessible to disabled detainees and the phones are mounted
     too high for use by those with certain mobility impairments.
     (Trial Tr. 171:3—172:5, 991:25—994:24.)  Unlike the facilities on
     the rooftop of the MCJ, the restrooms are not located up a flight
     of stairs.  (Trial Tr. 171:18—22.)  An accessible sink could be
     installed; an outdoor toilet could be installed; and a phone
     could be lowered to be accessible.  (Trial Tr. 991:25—994:24.)
     The cost of altering the existing bathroom to permit entry for a
     wheelchair and modifying the toilet would be around $14,000;
     alternatively, installing a compliant lavatory outside the
     bathroom would cost $1,000.  (Trial Tr. 172:8—22.)

105. Absent these modifications, during a typical one-hour period of
     rooftop recreation, officers would escort disabled detainees to
     their housing location to use the restroom because the rooftop
     facilities are not accessible.  (Trial Tr. 1021:19—1022:5.)

     **F.   Physical Barriers at Theo Lacy**

          **i.   Module O**

106. Module O at Theo Lacy was built in 2001 to be the modern
     infirmary for the jail.  (Trial Tr. 720:15, 730:21—25,
     903:21—904:8.)  It is considered a "new" facility under ADA
     regulations, so it must be "readily accessible to and usable by
     individuals with disabilities."  See 28 C.F.R. § 35.151(a).
     (Docket No. 731 at 16.)

107. As one of the six sectors that comprise Module O, Sector 37
     contains an open ward with attached shower and restroom
     facilities, as well as some specialized individual cells.  (Trial
     Tr. 114:21—116:22, 120:5—121:11; Trial Ex. 4 at 41.)

108. Sector 37 has outlets for oxygen, as well as electrical outlets by the beds for medical-assistive devices, and some of the beds are hospital-style beds with rails. (Trial Tr. 465:8—14, 731:1—6.)

109. Sector 37 contains the only negative pressure cells in the entire Orange County Jail system for the housing of individuals with infectious diseases. (Trial Tr. 466:5—11.)

110. The remaining sectors in Module O do not have an open bed ward: they house inmates in one- or two-person cells that face out to a dayroom that contains a shower and a toilet. Each cell has a toilet and sink. (Trial Tr. 114:21—116:22, 120:5—121:11; Trial Ex. 4 at 41.)

111. Module O at Theo Lacy houses mobility- and dexterity-impaired inmates and detainees who must use canes, walkers, and crutches, and those who have prosthetic arms or legs. (Trial Tr. 460:13—461:2, 720:25—721:13, 723:1-4; Trial Ex. 36 (Jail Policy Number 125.01).)

112. So long as inmates or detainees with these conditions can walk, can go to the treatment room to see a nurse, and can feed and take care of themselves, they may be housed in Module O of Theo Lacy. (Trial Tr. 723:14—25.) Individuals in wheelchairs — even those fit enough to complete a marathon in a wheelchair — may not be housed at Theo Lacy because they cannot walk. (Trial Tr. 723:14—724:18; Trial Ex. 36.)

113. Individuals housed in Sector 37 have access to only one shower, which has no accessible features, such as a fold-down seat, grab bar, modified controls, and properly located shower head or shower hose, which poses a hazard for someone with a disability.

30

1    (Trial Tr. 116:23—119:14, 904:22—905:25; Trial Ex. 4 at 42—43.)

2    The estimated cost of making the shower accessible through

3    installation of the proper seat, grab bars, controls, and shower

4    head is $3,000 to $4,000. (Trial Tr. 119:15—20.)

5  114. The phones in the dayroom are too high and the tables have not

6    been made accessible. (Trial Ex. 4 at 41.)

7  115. None of the cells in Sector 41 (one of five identical sectors in

8    Module O in addition to Sector 37) have been modified, although

9    disabled detainees and inmates are housed there. (Trial Tr.

10    122:23—123:15; Trial Ex. 4 at 40.)

11  116. The shower in the dayroom in Sector 41 has not been modified to

12    be accessible to individuals with disabilities: it has a curb, no

13    grab bars, and no fold-down seat. (Trial Tr. 121:2—122:9; Trial

14    Ex. 4 at 37-38.) The estimated cost of making the shower

15    accessible is estimated to be approximately $3,000 to $5,000.

16    (Trial Tr. 122:10—22.)

17  117. Two percent of the cells in the five identical sectors in Module

18    O could be made accessible, with modified toilet, sink, and

19    shower facilities. (Trial Tr. 123:16—125:5.) The evidence is

20    insufficient to determine what the exact number should be (Trial

21    Tr. 124:5—125:5), so the County is ordered to provide Plaintiffs'

22    counsel and the Court with the number of total cells in order to

23    determine the two-percent figure. This must be included in the

24    plan which the Court has ordered. See Section V, Injunctive

25    Relief, infra.

26  118. The evidence does not demonstrate that accessible grab bars pose

27    a suicide risk sufficient to justify not installing them in

28    Module O of Theo Lacy. (Trial Tr. 905:22—25.)

119. Nor does the evidence demonstrate that a 36-inch wide doorway
poses a security risk that would excuse any modifications to
widen doorways in Module O of Theo Lacy.  (Trial Tr.
910:3—911:1.)

### ii.  Barracks Housing

120. The Barracks-style housing at Theo Lacy, namely Dorms A through D
and Barracks F, G, and H, houses low-security inmates and some
low-security pretrial detainees.  (Trial Tr. 492:8—22.)  Those
facilities have not been modified to be accessible to individuals
with mobility and dexterity impairments.  (Trial Tr.
153:12—156:19.)

121. The showers and toilets in the Theo Lacy barracks can be modified
to be made accessible.  (Trial Tr. 912:17—914:9.)  The total
expense to modify one of the barracks by installing a fold-down
seat, grab bars, and an ADA-approved shower unit with proper
controls and a proper shower head, was estimated by the County's
expert at $4,000 to $5,000; Plaintiffs' expert estimated it to
cost no more than $9,000 to $10,000.  (Trial Tr. 153:12—155:4.)

122. However, Plaintiffs seek these modifications in order to compel
the County to house low-security disabled detainees with low-
security non-disabled detainees and inmates in the barracks.
This is a form of mainstreaming that the Court has rejected as
foreclosed by the Ninth Circuit's decision.  (Docket No. 731 at
11—12.)

### G.  Physical Barriers at Musick

123. Inmates assigned to the James Musick facility are all "low level,
low security inmates, sentenced and unsentenced."  (Peterson Dep.
Tr. 40:20—25.)  They have been further screened to ensure that

1  they pose a low escape risk, that they have a low bail posted,

2  and that they are not facing or sentenced on any violent charges.

3  (Peterson Dep. Tr. 40:18—45:20.)

4  124. Mobility- and dexterity-impaired detainees are not housed at

5  Musick primarily because there is no 24-hour medical care at that

6  facility.  (Peterson Dep. Tr. 46:12—48:4.)  All disabled

7  detainees are therefore excluded, regardless of a detainee's

8  actual health or condition.  (Trial Tr. 733:1—737:23.)  Although

9  there is no 24-hour medical staff, a nurse is on duty at Musick

10  from 5:30 a.m. until 10:00 or 11:00 p.m.  (Trial Tr. 755:19—24.)

11  **i.   North, South, East, and West Compounds**

12  125. Musick is comprised of four housing compounds called North,

13  South, East, and West.  (Trial Tr. 197:9-11, 503:11—21.)  None of

14  these housing areas at Musick has been modified to be accessible

15  to disabled detainees.  (Trial Tr. 914:10—13.)

16  126. The South Compound houses 30 to 40 female inmates in each of

17  three large dormitory rooms.  Each room is equipped with an open

18  and large dayroom area, shower, toilet, and sink area.  The back

19  door of the compound is equipped with a ramp leading down to a

20  large grassy area with picnic tables and some areas for sports.

21  (Trial Tr. 197:12—24.)

22  127. Given that an accessible ramp already exists, the South Compound

23  could be made accessible through construction of an ADA-compliant

24  toilet, sink, and shower, which would cost around $5,000 for the

25  toilet and sink by the County's expert's estimate, and a total of

26  $18,000 to $19,000 for the toilet, sink, and shower, by

27  Plaintiffs' expert's estimate.  (Trial Tr. 915:13—917:9,

28  209:21—214:4; Trial Ex. 4 at 104, 107, 111, 112.)

128. Immediately adjacent to the South compound is a large classroom
     building used for classes; when Plaintiffs' expert was touring
     the facility in 2009, a sewing class was in progress. (Trial Tr.
     197:21—198:4.)

129. The North compound is made up of Quonset hut structures
     configured around an open area with trees, grass, sports
     equipment, and phones, and restrooms with showers in adjacent,
     but separate, structures. Each houses 30 to 40 male inmates.
     (Trial Tr. 198:5—20.)

130. The separate restroom building in the North Compound is a
     trailer-type units separate from the housing units; it is made of
     wood and could be retrofitted for plumbing more easily than a
     concrete and steel structure. (Trial Tr. 198:19—20, 540:9—15.)

131. The West Compound houses additional male inmates and is comprised
     of four structures built around a center grass- and tree-filled
     courtyard. (Trial Tr. 198:21—199:1.)

132. The East Compound, which was undergoing substantial
     reconstruction during the 2009 inspection, is comprised of two
     large dorm rooms and also houses male inmates. The
     reconstruction included restrooms, toilets, showers, bunk areas,
     and bookcases for each inmate. (Trial Tr. 199:4-199:12.)

133. The showers, sinks, and toilets in the East Compound could be
     modified in ways similar to other restroom facilities at a total
     expense of $11,000 to $15,000. (Trial Tr. 214:4-217:14; Trial
     Ex. 4 at 124, 128—30.)

          ii.  **Overall Layout and Accessibility**

134. Many buildings at Musick are equipped with ramps, and ramps could
     be installed in other buildings to make them accessible. (Trial

34

Tr. 914:14—25.)

135. For example, the building at Musick where many of the shop classes are held has a ramp and is otherwise accessible.  (Trial Tr. 917:10-23.)

136. Similarly, the visitor center at Musick, where classes are given and contact visitation occurs, is already fully accessible as a result of the construction of a recent ramp.  (Trial Tr. 217:22—218:23, 915:1—3.)

137. A ramp was also being added to the medical unit at Musick to make it accessible to individuals in wheelchairs.  (Trial Tr. 919:7—24.)

138. Thus, the overall layout of many of the areas at Musick could allow detainees with mobility and dexterity impairments to move freely, given the existing ramps and the modest grade changes between buildings.  (Trial Tr. 988:16—991:24; Trial Ex. 4 at 113—115.)

139. To the extent Plaintiffs offer this evidence to show that the County could house low-security disabled detainees with low-security non-disabled detainees and inmates at Musick, Plaintiffs seek a form of mainstreaming that the Court has rejected as foreclosed by the Ninth Circuit's decision.  (Docket No. 731 at 11—12.)  However, as discussed below, this evidence is relevant to determining whether disabled detainees could be brought to Musick to take advantage of programs, services, and activities offered only at that facility.

**H.   Programs, Services, and Activities**

140. Each jail facility offers a number of programs, services, and activities.  The Court must determine whether "[a]ny type of

1   educational, vocational, rehabilitative, or recreational program,

2   service, or activity offered to nondisabled detainees . . . when

3   viewed in its entirety, [is] similarly available to disabled

4   detainees who, with or without reasonable accommodations, meet

5   the essential eligibility requirements to participate." Pierce,

6   526 F.3d at 1222.

7       i.    Programs, Services, and Activities at Musick

8   141. As determined above, Musick houses no detainees with mobility and

9   dexterity impairments, so disabled detainees are automatically

10   excluded from any programs, services, and activities offered only

11   at Musick.

12   142. There is a fully accessible programming building adjacent to the

13   South Compound where inmates can take classes, including sewing

14   classes.  (Trial Tr. 203:2—9, 207:7—22; Trial Ex. 4 at 115.)

15   143. Indeed, sewing classes are only offered at Musick.  (Trial Tr.

16   563:18—23; Exh. 156 (amended).)

17   144. There are also three buildings (referred to as "portable"

18   classrooms) that are used to provide some of the educational

19   class offerings at Musick.  One of them is equipped with a ramp

20   to make it generally accessible to disabled persons (and the

21   addition of a handrail at the cost of several hundred dollars

22   would make it fully accessible).  (Trial Tr. 205:2—207:6; Trial

23   Ex. 4 at 103.)

24   145. Vocational classes are also offered in another building near the

25   North Compound at Musick, including woodworking, painting, and

26   veneering.  This "shop" building is fully accessible in its

27   current state.  (Trial Tr. 207:24—209:18; Trial Ex. 4 at 126.)

28   146. Food Service, a popular vocational class preparing inmates to

work in the restaurant business, is offered at Musick.  (Trial
Tr. 562:25—563:10.)

147. Stained-glass making, a rehabilitative program, is offered at
Musick.  (Trial Tr. 563:24—564:21.)

148. Other construction vocational classes are offered only at Musick,
including cabinetry and welding.  (Trial Tr. 564:22—565:14.)

149. In addition, the following classes are offered only at Musick:
job development, job preparation, and Mothers of Preschoolers,
Pastoral Counseling (Trial Ex. 156 (amended)), and an empowerment
class (although it is not an ongoing class) (Trial Tr. 802:3—25).

150. In addition to classes and programs, Musick provides inmates with
numerous facilities for outdoor exercise and recreation,
including a baseball field used by inmates without the presence
or supervision of guards, volleyball courts, basketball courts,
picnic areas, banks of phones, and horseshoe pits.  (Trial Tr.
199:13—200:6, 201:3—203:19; Trial Ex. 4 at 100, 101, 102, 113,
114.)

151. All of the outside areas at Musick are accessible to inmates and
detainees with mobility or dexterity impairments if such
individuals were permitted to use them.  (Trial Tr.
203:20—205:1.)

152. Likewise, Musick is the only facility within the Orange County
jails that allows contact visiting with family members.  (Trial
Tr. 474:18—21.)

ii.  **Programs, Services, and Activities at Theo Lacy**

153. At Theo Lacy, a classroom facility referred to as the Inmate
Programming Building contains a library with books, a chapel, a
visiting area, and several large classrooms, one of which is

equipped with 24 computers.  The facility is fully accessible to individuals with disabilities, including one accessible bathroom. (Trial Tr. 127:6—130:6, 138:6—15, 468:10—469:11; Trial Ex. 4 at 33, 44.)  Moving individuals between Module O at Theo Lacy and the Inmate Programming Building would merely require some additional personnel.  (Trial Tr. 469:17—470:3.)

154. The Inmate Programming Building offers numerous classes to inmates every day of the week, such as ESL, substance abuse, food service classes, software application classes, GED instruction, adult basic education, and others.  (Trial Tr. 572:3—573:10; Trial Ex. 45 at 20—27.)

155. Inmates and detainees with mobility and dexterity impairments housed at Theo Lacy are not allowed to use the Inmate Programming Building.  (Trial Tr. 129:15—19, 468:20—22.)

156. The disabled inmates housed in Module O at Theo Lacy are offered only religious services – Catholic services on one day, Bible study the next, Protestant services another day.  On Mondays, Fridays, and Saturdays, no classes are offered.  (Trial Ex. 45 at 20-27.)

157. Moreover, the main classroom in Module O at Theo Lacy is only big enough to accommodate six to ten people and has no desks, computers, or other equipment.  The only other room available for classroom use in Module O is a 100-square-foot office without any books, computers, teaching materials, or desks.  (Trial Tr. 125:6—126:14, 569:21—572:2; Trial Ex. 4 at 48.)

158. According to the County's expert, as a reasonable alternative to modifying the small classrooms in Module O at Theo Lacy, the County could simply allow inmates and detainees from that

facility to use the fully accessible and adjacent Inmate
Programming Building. (Trial Tr. 1143:12-1144:5.) There is no
evidence that this accommodation would impose undue financial or
administrative burdens on the County. (Trial Tr. 864:23—865:3.)

159. Similarly, disabled inmates and detainees have no access to
rehabilitation programs offered to non-disabled inmates. For
example, the New Start Program for drug rehabilitation is only
offered to inmates housed in Barracks A through H of Theo Lacy
and therefore is entirely off limits to disabled detainees
because they are barred from the Barracks units. (Trial Tr.
460:13—461:2, 475:8—476:4, 720:25—721:13, 723:1-4.)

160. Minimum security inmates at Theo Lacy can participate in work
assignments, such as kitchen crews, module workers who deliver
food, landscaping crews, paint crews, and recreation program
workers who assist in the library. (Trial Tr. 476:9—477:10.)

161. However, those work assignments are limited to sentenced inmates,
not pretrial detainees. Because the class is limited to disabled
pretrial detainees, class members would not be eligible for these
assignments. (Trial Tr. 489:5—490:20.)

162. In addition to programs and services, non-disabled detainees and
inmates at Theo Lacy are also allowed to exercise in an area
referred to as the "Green Sector," which includes a running
track, horseshoe toss area, volleyball court, baseball field with
backstop and bleachers, and large green fields. (Trial Tr.
111:7—112:21; Trial Ex. 4 at 22.)

163. Non-disabled low-security detainees and inmates housed in the
Barracks area (Barracks A-D) of Theo Lacy are also regularly
allowed to use grassy outdoor areas equipped with picnic tables

1    because such areas are immediately outside their dayroom and dorm

2    area.  (Trial Tr. 113:11—114:20, 480:4—16, 481:22—25.)

3    164. Disabled detainees and inmates housed in Module O currently are

4    not allowed to use the Green Sector.  (Trial Tr. 111:7—112:21,

5    470:4—471:2; Trial Ex. 4 at 22.)

6    165. For detainees in Module O, the only exercise area currently

7    available is an approximately 35-foot-by-60-foot interior

8    blacktop area with a basketball hoop, which does not allow for

9    most of the sports activities available to non-disabled detainees

10   in the Green Sector.  (Trial Tr. 472:10-473:23, 771:18—772:1;

11   Trial Ex. 4 at 36.)

12   166. There is no physical barrier preventing inmates in Module O from

13   using the Green Sector for outdoor exercise if the jail provided

14   additional personnel to escort them there.  (Trial Tr. 471:3—9.)

15   167. According to the County's expert, then, the County could permit

16   Module O inmates to use the Green Sector field at Theo Lacy as a

17   reasonable accommodation to offset the inferior exercise area in

18   Module O.  (Trial Tr. 1144:6—14.)

19        **iii. Programs, Services, and Activities at the MCJ**

20   168. Inmates in Ward C and Ward D at the MCJ are confined to those

21   wards and have access only to a small dayroom, which has no

22   windows or natural light.  There is no attached outdoor

23   recreation area they can use.  (Trial Tr. 57:20—58:22, 68:14—19.)

24   169. Sheltered Living detainees and inmates are locked in their

25   individual cells except for a few hours each day when they are

26   moved to the 12-foot-by-12-foot dayroom, where there is a phone,

27   table, television, and shower.  (Trial Tr. 69:10—71:16; Trial Ex.

28   4 at 93—96.)

170. Hopper testified that Ward C, Ward D, and Sheltered Living together are the "grimmest and most dismal" of all of the jail facilities because the quarters are tight, it is dirty, there is little natural light, and there are few available activities, such as books and other materials. (Trial Tr. 84:22–86:1.)

171. The dayroom in the Sheltered Living area in Module O is the smallest dayroom in the entire jail system that Hopper inspected in 2009. It has no recreational or educational materials in it, such as games, cards, or books, and has only a television, table, and newspaper. (Trial Tr. 84:23–86:1, 842:18–843:16.)

172. Other than the basketball hoop, no specialized equipment is provided in any of the jail's recreation areas to allow individuals with mobility impairments to get upper body exercise. Hopper testified that other correctional facilities have provided alternative equipment to provide individuals with disabilities with access to recreation. (Trial Tr. 105:14–107:15.)

173. Plaintiff Timothy Conn testified that he was never offered outdoor recreation while in Ward C in 2009, was never permitted to go outside, and did not observe anyone with a mobility or dexterity impairment being called by deputies for roof recreation. (Trial Tr. 600:6–601:10.)

174. During his incarceration in 2009, Plaintiff Conn was not given the opportunity to go to chapel or religious services. (Trial Tr. 601:11–13.)

175. Although he was aware that there were classes, programs, and services provided at the MCJ, Plaintiff Conn did not ask for and was not offered any classes or programs while in Ward C in 2009. (Trial Tr. 607:2–5, 617:11–18.) He could have requested them via

the jail's message slip system, but did not.  (Trial Tr. 617:19—618:23.)  He also did not ask and was not given the opportunity to attend any classes or programs outside Ward C. (Trial Tr. 619:5—14, 634:5—7.)

### iv.  Programs, Services, and Activities at the IRC

176. The classes currently being offered in Module K of the IRC (where women with disabilities are housed) are more limited than those offered at Musick to the non-disabled female population.  (Trial Tr. 580:3—582:11.)

177. Disabled inmates in Module K are not offered GED classes, Government, ESL, positive parenting, workforce preparation, food service, health classes, MOPS (Mothers of Pre Schoolers), stained-glass making, or sewing classes.  (Trial Tr. 580:3—582:11.)

178. Moreover, the educational and rehabilitative classes that are offered in Module K are offered in classrooms up a flight of stairs and are entirely inaccessible to detainees and inmates with mobility impairments.  (Trial Tr. 686:8—11.)

179. If a disabled detainee wants to take such a class, she can request that it be provided to her in an open area, not equipped with desks or computers, directly in front of the guard station, or in the chapel, in front of the housing guard.  (Trial Tr. 686:12—19.)

180. Melodie Bloom, former deputy at the WCJ and current deputy at the IRC, testified that she had only seen a class provided outside the guard station once for a several-week period, to one inmate who was taking the class by herself.  (Trial Tr. 644:20—645:12, 687:19—688:4.)

181. Indeed, inmates and detainees would not want to have guards nearby when they take certain classes, such as narcotics anonymous, AIDS education, domestic violence, and substance abuse, so a disabled female detainee in Sector K probably would not submit a request to take those classes. (Trial Tr. 766:18—767:11, 863:6—25.)

182. The chapel room servicing Module K in the IRC is on the same floor at the housing cells and could be used a classroom for mobility-impaired inmates. (Trial Tr. 764:22—766:17, 850:6—853:14.)

**v.   Comparison of Classes and Programs Offered at Various Facilities**

183. The County attempted at trial to demonstrate some parity among the classes and programs offered at the IRC/MCJ, Musick, and Theo Lacy. (Second Amended Trial Ex. 156.)

184. Exhibit 156 shows some differences among programs offered at different facilities, but it does not set forth differences between classes and programs offered at Musick as compared to Module K of the IRC. (Trial Tr. 853:23—854:5.)

185. The County stipulated that Exhibit 156 also does not show the difference between the classes and programs offered at Musick as compared to those offered at Module O at Theo Lacy. (Trial Tr. 853:15—22.)

186. According to Exhibit 156, sixteen classes were offered at the MCJ and/or the IRC, but not at Musick, and ten classes were offered at the MCJ and/or the IRC, but not at Theo Lacy. On the other hand, only one class was offered at Theo Lacy, but not at the MCJ or the IRC, and seven classes were offered at Musick (including

1   "shop" classes like cabinetry, welding, and stained-glass

2   making), but not at the MCJ or the IRC.  (Trial Tr.

3   821:4—835:22.)

4   187. A motivational-type class for female inmates called "Empowerment"

5   was also offered at Musick, but not at the IRC, and, for one

6   class, it involved a guest speaker in a wheelchair talking to

7   inmates.  (Trial Tr. 802:3—25.)

8   188. A class called "Job Preparation" for female detainees and inmates

9   was offered at Musick, but not the IRC, because it was a "pilot"

10   program being tested at one facility to see how it would be

11   received.  (Trial Tr. 803:6—21.)

12   189. While "Job Development" was offered at Musick, but not at the IRC

13   and the MCJ, it was similar to "Career Planning" offered at the

14   IRC/MCJ.  (Trial Tr. 799:3—25.)

15   190. Importantly, none of the "shop"-type classes offered at Musick,

16   such as cabinetry, sewing, stained-glass making, and welding,

17   were offered at the IRC or the MCJ.  (Seconded Amended Trial Ex.

18   156.)  Plaintiff Conn testified that he would not be able to take

19   the welding or cabinetry classes due to his dexterity

20   impairments, but other class members with mobility impairments

21   may be able to.  (Trial Tr. 633:3—13.)

22   191. While there was some evidence that offering machinery-intense

23   classes like welding and cabinetry at the IRC or the MCJ would be

24   prohibitively expensive, the County failed to demonstrate why

25   less costly or less machinery-intensive vocational classes, such

26   as drafting, computer-assisted drawing, electrical wiring, or

27   plumbing, could not be introduced at the IRC or the MCJ.  (Trial

28   Tr. 846:14—847:22.)

192. The sewing class is only offered at Musick because it uses an
     entire large classroom filled with sewing machines and large
     tables used for cutting large sheets of material. (Trial Tr.
     807:5—13.)  The County admitted that it would be possible to move
     all of the machinery to the IRC, although it would take up an
     entire classroom. (Trial Tr. 807:18—808:8.)  If fewer than all
     machines were moved, there would be little problem with using
     some sewing machines for a sewing class at the IRC. (Trial Tr.
     582:3—11, 766:7—11, 856:10—19.)

193. The stained-glass making class offered at Musick is not a
     vocational class, but a class presented by a religious volunteer
     in which the inmates make stained glass angels to be given away
     as a community service. (Trial Tr. 808:12—809:4.)  The process
     requires large tables, scissors, tin snips, and other tools which
     would be difficult to accommodate at the MCJ or the IRC due to
     space constraints. (Trial Tr. 809:8—20.)  However, the County
     admitted that some modified form of the class could be easily
     accommodated in the classrooms at the MCJ or the IRC. (Trial Tr.
     582:3—11, 856:15—858:12.)

194. "MOPS" stands for "Mothers of Preschoolers," which is a class
     presented by a volunteer group that comes to Musick to help
     primarily female inmates get back together with their preschool
     children upon release.  It is staffed by a church group and could
     be offered at the IRC or the MCJ, so long as enough volunteers
     are provided.  While the County staff cannot order volunteers to
     give the class, staff members could offer the class at the IRC or
     the MCJ when enough volunteers are available. (Trial Tr.
     813:8—814:21.)

195. "Food Services" is a class offered at Musick and Theo Lacy, but not at the IRC or the MCJ, ostensibly because the County has trouble finding qualified instructors. (Trial Tr. 821:11—822:14.) The County admitted, however, that the class could be offered at other facilities and the existing instructors could split time between Musick and Theo Lacy, on the one hand, and the IRC and the MCJ, on the other. (Trial Tr. 860:12—861:22.)

196. To the extent that a class could not be offered at the IRC or the MCJ, there was evidence that disabled detainees could be transported from the IRC and the MCJ to Theo Lacy or Musick to take those classes. (Trial Tr. 1144:15—22.)

I.   **The County's Showing of Fundamental Alterations and Undue Burden**

197. The County offered little specific evidence of the fiscal or other impact of altering either the physical facilities in the jail system or providing programs, services, and activities in ways to accommodate mobility- and dexterity-impaired detainees.

i.   **Fiscal Impact**

198. Greg Boston, a manager with the Orange County Jail system in charge of the Inmate Services Correctional Programs Unit, the Inmate Reentry Unit, and the Inmate Welfare Fund, testified as the County's person most knowledgeable on the County's programs and services. (Trial Tr. 548:5—549:11.) While he testified that there was a $24 million shortfall in the overall 2009/2010 Sheriff's Department's budget, he lacked the foundation to testify to any budgetary matters beyond the inmate programs budget. (Trial Tr. 836:6—840:19.) The County provided no

1      further evidence on this point.

2  199. The County claims that the WCJ was closed due to budgetary

3      issues, but provided no evidence to substantiate that.

4  200. However, the evidence does establish that the County had to lay

5      off three full-time employees due to budgetary issues, which

6      resulted in eliminating the horticulture, construction, and

7      commercial painting classes at Musick.  (Trial Tr. 782:7—15,

8      797:15—22.)

9  201. There is also a current hiring freeze for nurses, possibly caused

10      by budgetary issues.  (Trial Tr. 746:21—747:16.)

11  202. With regard to physical barriers, the County offered no specific

12      evidence that it could not pay the costs of reasonable

13      modifications identified by Plaintiffs' expert.

14  203. Plaintiffs have raised the possibility that disabled inmates

15      could be bussed from the IRC and the MCJ to Musick and Theo Lacy

16      to take advantage of the programs, services, and activities that

17      could not be provided at the IRC and the MCJ.

18  204. There are no physical barriers to bussing disabled inmates from

19      the IRC and the MCJ to Musick or Theo Lacy for classes, programs,

20      and recreation, and, indeed, inmates are bussed frequently for

21      court purposes.  (Trial Tr. 858:13—860:11.)

22  205. The County offered no specific evidence of the cost of bussing

23      disabled detainees from the MCJ and the IRC to Theo Lacy and

24      Musick to utilize those facilities, other than to say that

25      bussing would be "very costly."  (Trial Tr. 865:8—13, 868:8—20,

26      873:3—16.)

27  206. Current bussing for court purposes is coordinated by a

28      transportation division separate from the Inmate Services

department supervised by Greg Boston, and it has suffered its own budget cuts, so Boston did not believe that, at its current staffing levels, the transportation division could bus disabled inmates for programming purposes. (Trial Tr. 868:21—869:20.) Other than this testimony, however, the County offered no other specific evidence to support this point.

207. With regard to the cost of programs and classes, most of the inmate programs and services are paid for by the inmates themselves out of the Inmate Welfare Fund. (Trial Tr. 549:12—550:24; Trial Ex. 29.) The Inmate Welfare Fund receives income from inmate telephone revenue as part of a contract with the phone company, sales of commissary supplies to inmates, and rents from a building the County owns. (Trial Tr. 550:6—552:17.) In the five years up to and including 2009, the Inmate Welfare Fund received $2.5 million in profit from the telephone contract. (Trial Tr. 551:19—552:3.) It received approximately $1 million in profit from the commissary each year during the same period. (Trial Tr. 552:4—10.)

208. The County also receives some free or nearly free educational services, including classes and a computer lab provided by Rancho Santiago Community College. (Trial Tr. 553:3—554:14.) Moreover, the County receives $300,000 a year for permitting Rancho Santiago Community College to provide services in the jail system. (Trial Tr. 554:3—555:3.)

209. The County also has over 1000 community volunteers providing programs for inmates for a total of 7,445 hours of service during the year. (Trial Ex. 29.)

### ii.   Impact on Security

210. There are no prohibitions against inmates with mobility-assistive devices such as wheelchairs, walkers, and crutches taking classes with non-disabled inmates, suggesting they do not pose a serious security risk.  (Trial Tr. 768:9—19.)

211. There is little evidence that grab bars pose a hanging hazard, as contended by the County.  (Trial Tr. 498:1—24.)

212. Ron Bihner, the County's witness on construction issues, had never been told that grab bars could not be installed in the shower in Module O of the MCJ because of concerns regarding suicide (Trial Tr. 905:22—25), or that the ADA-compliant combination unit installed in a cell in Module L of the MCJ in November 2004 would pose a hanging hazard (Trial Tr. 884:21—25).

213. If the County were correct on the risks of hanging posed by standard grab bars, many other existing features of the jails would pose similar hazards, such as grab bars already installed by the County around the toilet in Sector 37 of Module O in the MCJ (Trial Tr. 535:15—536:2), handles on cell doors, handrails nears stairs or ramps, and bars on windows (Trial Tr. 520:17—25, 525:20—25, 538:1—11).

214. Michael Gibbens, the County's expert on ADA compliance and accessibility, also acknowledged that the Department of Justice has issued a design guide for accessible cells in correctional facilities, which describes proper modifications to make the cells accessible for mobility- and dexterity-impaired individuals; the design guide includes grab bars as an accessible feature.  (Trial Tr. 1114:12—1120:12.)

215. Those guidelines provide that, where suicide is a concern,

1    special grab bars can be installed which do not allow for items

2    to be tied to the bars, but which provide enough support for

3    disabled individuals.  (Trial Ex. 47.)

4         **iii. Other Impacts**

5    216. The Court rejects the County's suggestion that individuals in

6    wheelchairs could not be placed in the new medical facility in

7    Module O at Theo Lacy because Module O is on the third floor of

8    that building and the elevator to Module O sometimes breaks down.

9    (Trial Tr. 725:20—727:10.)  No competent evidence was presented

10   that the elevator at Theo Lacy could not be repaired when it

11   breaks down.  (Trial Tr. 759:23—760:17.)  Once the elevator is

12   fixed and maintained, the situation in Module O of Theo Lacy is

13   no different from Module O at the MCJ, where all mobility- and

14   dexterity-impaired detainees are housed on a floor reached by

15   elevator or escalator.  (Trial Tr. 726:13—22.)

16   217. Module O at Theo Lacy has an RVN and an LVN for the approximately

17   100 inmates and detainees who can be housed there, while only one

18   nurse serves inmates who can be housed in Ward C of Module O at

19   the MCJ.  There are no nurses assigned to Sheltered Living at the

20   MCJ, even though it can house orthopedic cases, inmates with back

21   injuries requiring bed rest, paraplegics, and quadriplegics.

22   (Trial Tr. 717:13—718:22, 724:19—25.)

23   218. Therefore, the Court cannot credit the County's justification for

24   the policy of excluding wheelchair-bound individuals from Module

25   O of Theo Lacy because the medical staffing level of one nurse to

26   100 inmates is inadequate to attend to the "medical needs" of

27   wheelchair-bound inmates, which include checking the inmates for

28   skin irritations.  (Trial Tr. 724:19—725:3, 748:1—9.)

219. Moreover, nurses may not provide assistance to disabled detainees and inmates with their activities of daily living, so nurses would not regularly assist wheelchair-bound detainees in Module O of Theo Lacy.  (Trial Tr. 724:19—730:20.)

220. The Ninth Circuit held that deputies also cannot provide this level of assistance to individual inmates because they are already overburdened with ordinary security tasks.  <u>Pierce</u>, 526 F.3d at 1220.

221. The evidence also demonstrates that paraplegics who have no health problems and who can take care of themselves in their daily living could be assigned to Module O of Theo Lacy, given its bed arrangement, accessible toilet and sink, and their non-acute medical situation.  (Trial Tr. 756:18—758:12.)

**J.   ADA Notice of Rights and Complaint Procedures**

222. In remanding this case, the Ninth Circuit instructed the Court to make findings on the issues of whether disabled detainees were "denied adequate notice of their rights under the ADA and an appropriate grievance procedure, as required by regulations." <u>Pierce</u>, 526 F.3d at 1223 (citing 28 C.F.R. §§ 35.106, 35.107).

**i.   Notice Procedures Before 2009**

223. The evidence demonstrates (and the County has essentially admitted) that, at least until mid-2009, disabled inmates with ADA-related complaints did not know their rights under the ADA, did not know that they could file a complaint if those rights were violated, and did not know how to file a complaint if necessary.  (Trial Tr. 49:12—21.)

224. For example, as of mid-2009, the County had not established any procedure specifically informing disabled inmates and detainees

of their rights under the ADA and had not provided them with a
specialized grievance procedure to complain if they believed they
were being denied an accommodation or access to facilities,
services, or programs.  (Peterson Dep. Tr. 58:2-64:9.)

225. No notice of rights under the ADA had been posted anywhere in the
jails.  (June 10, 2010 Trial Tr. 40:19—25.)

226. Before mid-2009, two forms were available to detainees and
inmates if they want to make any sort of request or complaint
about their treatment within the jails: an "inmate message slip,"
or a "snivel," as nicknamed by deputies and inmates (Trial Tr.
662:24—663:24); and pink message slips used to request medical or
mental health services (Trial Tr. 662:24—663:24).  Prior to
trial, all grievances were handled in the same manner, whether
filed by disabled or non-disabled inmates and detainees.  (Trial
Tr. 24:14—19.)

227. While an inmate could conceivably use an inmate message slip to
complain about ADA-related issues (Trial Tr. 40:5—9), there was
no language on the inmate message slip explaining to inmates
their rights to be free from discrimination under the ADA or
their ability to seek an accommodation if one was needed (Trial
Tr. 12:12-18; Trial Ex. 159).

228. Inmate message slips were not sent to any ADA coordinator for
processing.  (Trial Tr. 13:3—14:8.)  And the deputies who had the
initial responsibility for reviewing or deciding what to do with
the inmate message slip had not been provided with any written
criteria as to how to evaluate a request for an accommodation.
(Trial Tr. 15:14-19.)

229. The County failed to identify a single request for an

accommodation made by a person with a disability in the past
year.  (Trial Tr. 30:22—31:1.)  In order to determine whether ADA
issues have ever been raised on inmate message slips, County
officials would have had to look at the message slips placed in
each individual inmate's file.  (Trial Tr. 31:8—32:21.)

230. There was no language on the pink medical message slips
explaining to inmates their rights under the ADA, their ability
to request an accommodation, or their recourse if they believed
they were being treated unfairly because of their disability or
being denied an accommodation related to some activity, service,
or program.  (Trial Tr. 17:13—25.)

231. The pink medical message slips were not turned over to any ADA
coordinator.  (Trial Tr. 18:15—17.)

232. Also, medical staff members were not provided any written
criteria or instructions as to what do with requests for
accommodation from disabled inmates or detainees that came via
the pink medical message slips.  (Trial Tr. 18:10—14.)

233. Inmates were not told that they could appeal if the response to
their medical message slip was inadequate.  (Trial Tr. 19:9—14.)

**ii.  Notice and Grievance Procedures After 2009**

234. In mid-2009, the County created a "grievance form" and instituted
a new grievance procedure.  (June 10, 2010 Trial Tr. 19:15—21:16;
Trial Ex. 161.)  The grievance form does not inform inmates of
their right to be free from disability discrimination, does not
explain that they can seek an disability accommodation if
necessary, and does not explain how they can complain about
violations of their ADA rights.  (Trial Tr. 19:15—21:3.)  As of
June 21, 2010, the County included a check-box on the grievance

form so an inmate can indicate that the complaint is related to a disability. (Docket No. 740 (Toledo Decl.) ¶ 3, Ex. B.)

235. Lieutenant Michael Toledo was designated in 2009 as the ADA coordinator for the Orange County Sheriff's Department. (Trial Tr. 8:18—9:1.)

236. Toledo testified that he was responsible for coordinating and addressing any ADA issues that affected the department, but that he had not been provided any written description of his responsibilities and had not received any specialized training or instruction as to what he was supposed to do as ADA coordinator. (Trial Tr. 10:6—16.)

237. The County did not inform jail deputies, staff, detainees, or inmates that Toledo had been designated as the ADA coordinator and did not provide them with his contact information. (Trial Tr. 10:17-11:3.)

238. On the eve of the last day of trial on June 21, 2010, Lieutenant Toledo for the first time discussed with the Assistant Sheriff of Corrections proposals to post ADA guidelines alongside jail rules and to include a box on the inmate grievance form where an inmate or detainee could communicate that a complaint is disability-related. (Trial Tr. 43:12—44:5; Trial Ex. 165.)

239. Thus, as of June 21, 2010, the County included within its posted jail rules an advisement regarding disabled inmates' rights under the ADA and the proper grievance procedures to report ADA violations. (Docket No. 740 (Toledo Decl.) ¶ 2, Ex. A.) The rules are now posted in dayrooms and housing facilities at all the jail complexes, although there was no evidence that those rules are posted at a height allowing a wheelchair-bound inmate

54

1  or detainee to read them.  (<u>Id.</u> ¶ 2; Trial Tr. 22:21—23:4; Trial
2  Ex. 164.)

3  240. While Toledo proposed to the Assistant Sheriff that
4  administrative sergeants be given the title of ADA coordinator,
5  no discussions had taken place as of June 21, 2010, regarding
6  their training or how they would handle ADA complaints.  (Trial
7  Tr. 47:2—48:25.)  Naming specific individuals as ADA coordinators
8  was administratively challenging due to staff turnover and
9  scheduling.  (Trial Tr. 42:8—18.)

10 241. The policy manual instructing deputies on handling grievance
11 procedures contains no specific instructions for handling inmate
12 requests for accommodation.  (Trial Tr. 25:22—26:1.)

13 242. Grievances are assigned a number and logged, but the deputy
14 charged with recording the numbers for grievances was not
15 provided with any training with respect to how to record a
16 grievance which includes a request for an accommodation.  (Trial
17 Tr. 33:6—34:17.)  Toledo did no know whether deputies were
18 directed to note in the computerized system if a request is an
19 ADA complaint or a request for an accommodation.  (Trial Tr.
20 34:18—21.)

21 243. Requests for accommodation would not be handled by Greg Boston or
22 directed to Lieutenant Toledo.  (Trial Tr. 26:13—25.)  Indeed,
23 grievances submitted to non-sworn staff, such as Greg Boston, are
24 considered invalid under the County's policy.  (Trial Tr. 27:4—7;
25 Trial Ex. 162 (Section 1600.5(c)).)

26 244. None of the staff involved in the appeal process has been
27 provided with specialized training or instruction on handling a
28 complaint that raises an allegation of or a concern relating to

1   ADA discrimination or that requests an accommodation.  (Trial Tr.

2   30:7—13.)

3   245.  In the past year, Toledo has not reviewed the computerized

4   grievance records to ascertain whether or not ADA issues have

5   been raised by inmates or detainees.  (Trial Tr. 35:15—23.)

6   Thus, he did not know at trial if any detainees or inmates had

7   been provided with any accommodation over the past year as a

8   result of a request by that detainee or inmate.  (Trial Tr.

9   35:24—36:2.)

10  **III.  CONCLUSIONS OF LAW**

11      **A.   Overview**

12  246.  For physical barriers, the Ninth Circuit directed this Court to

13  "conduct further fact-finding on the current state of physical

14  barriers to adequate access to bathrooms, showers, exercise

15  areas, dayrooms, dining rooms, cells and all other areas to which

16  disabled persons should have access and order remedial remedies

17  as required."  Pierce, 526 F.3d at 1226.  Thus, the issue to be

18  decided is whether barriers to access to facilities that

19  currently house mobility- and dexterity-impaired detainees exist

20  and if so, what remedial measures are necessary to assure ADA

21  compliance.  (Docket No. 731 at 9.)

22  247.  For access to programs, services, and activities, the Ninth

23  Circuit directed this Court to "conduct further fact finding as

24  to the programs and activities disabled persons currently have

25  access to and order such remedial measures as required to make

26  the County's provision of programs and services, when viewed in

27  their entirety, accessible to mobility- and dexterity-impaired

28  inmates."  Id. at 1226.  Thus, the Court must resolve two issues:

(1) whether, when viewing the programs, activities, and services offered by the County "in their entirety," mobility- and dexterity-impaired detainees are "categorically excluded" from programs, activities, and services offered to non-disabled detainees and inmates; and, if so, (2) what is the proper remedy.

**B.    Governing Law**

248. The parties agree that Title II of the ADA applies to the Orange County Jail system. Id. at 1214. Pursuant to Title II, a "qualified individual with a disability" cannot, "by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

249. The Attorney General has promulgated regulations implementing Title II, which are contained in Title 28, part 35 of the Code of Federal Regulations. See 28 C.F.R. §§ 35.149—35.151. Those regulations are therefore given "controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." Armstrong v. Schwarzenegger, 622 F.3d 1058, 1065 (9th Cir. 2010) (internal quotation marks omitted).

250. Section 35.150(a) requires a public entity to "operate each service, program, or activity so that the service, program, or activity, when viewed in its entirety, is readily accessible to and usable by individuals with disabilities." Section 35.150(a) applies to facilities existing before and unaltered after the effective date of the ADA on January 26, 1992.

251. This section places boundaries on what the County must do to make existing facilities compliant: "(1) a public entity is not

necessarily required 'to make each of its existing facilities accessible to and usable by individuals with disabilities,'"; and "(2) a public entity is not required 'to take any action that it can demonstrate would result in a fundamental alteration in the nature of a service, program, or activity or in undue financial and administrative burdens.'"  <u>Pierce</u>, 526 F.3d at 1215 (citing § 35.150(a)(1), (a)(3)).

252. Appendix A to Part 35 explains that "the program access requirement of title II should enable individuals with disabilities to participate in and benefit from the services, programs, or activities of public entities in all but the most unusual cases" and "compliance with § 35.150(a) . . . would in most cases not result in undue financial and administrative burdens on a public entity."  28 C.F.R. part 35, App. A.

253. The Ninth Circuit explained that the County may make existing facilities "readily accessible" by the "'reassignment of services to accessible buildings'" or by the "'alteration of existing facilities and construction of new facilities.'"  <u>Pierce</u>, 526 F.3d at 1215 (citing § 35.150(b)(1)).

254. For facilities built or structurally modified after the effective date of the ADA, § 35.151 applies.  While § 35.150 embodies a "flexible concept" of compliance for existing facilities, § 35.151 imposes "substantially more stringent" requirements.  <u>Kinney v. Yerusalim</u>, 9 F.3d 1067, 1071 (3d Cir. 1993).

255. Section 35.151(a) mandates that all new public buildings be "designed and constructed in such a manner" that they are "readily accessible and usable by individuals with disabilities[.]"  Section 35.151(b) provides that for any

facility "altered by, on behalf of, or for the use of a public entity in a manner that affects or could affect the usability of the facility or part of the facility shall, to the maximum extent feasible, be altered in such manner that the altered portion of the facility is readily accessible to and usable by individuals with disabilities[.]"

256. To satisfy § 35.151, a public entity may comply with either UFAS, 41 C.F.R. Pt. 101-19.6, App. A, or with the ADAAG, 28 C.F.R. Pt. 36, App. A.  Pierce, 526 F.3d at 1216 (citing § 35.151(a), (c)). Even though compliance with either ADAAG or UFAS is considered satisfactory, the regulations allow for "[d]epartures from particular requirements of either standard by use of other methods . . . when it is clearly evident that equivalent access to the facility or part of the facility is thereby provided."  § 35.151(c).

257. For buildings subject to § 35.150, Appendix A explains that the ADAAG Guidelines were issued by the Architectural and Transportation Barriers Compliance Board to apply to private buildings under Title III of the ADA, but were adopted by the Department of Justice to apply to public buildings under Title II.  Id.

258. Thus, as the Court previously held, the County need not strictly comply with UFAS or ADAAG guidelines to satisfy § 35.150 for the purposes of complying with the ADA.  (Docket No. 731 at 18—19.) But the Court may look to UFAS or ADAAG guidelines to decide whether barriers to access exist under that section.  See Flynn v. Doyle, 672 F. Supp. 2d 858, 879—80 (E.D. Wis. 2009) (finding that, for facilities built before 1992 and subject only to §

35.150 standards, "evidence regarding the alleged failure to meet
the UFAS/ADAAG standards could still be relevant in the context
of a 'program accessibility' case.  A program could be rendered
inaccessible if it is held in an inaccessible facility.");
Pascuiti v. N.Y. Yankees, 87 F. Supp. 2d 221, 226 (S.D.N.Y. 1999)
("[E]ven though only new construction and alterations must comply
with the Standards, those Standards nevertheless provide valuable
guidance for determining whether an existing facility contains
architectural barriers.").

259. Finally, the parties agree that CalDAG is not binding, but may be
"useful" in determining whether physical barriers exist and what
accommodations may be reasonable.

**C.    The ADA in the Prison Context**

260. In applying the ADA in the prison context of this case, the Court
must apply the standard from Turner v. Safley, 482 U.S. 78, 89
(1987), that "a regulation that would impinge on inmates'
constitutional rights is nevertheless valid if it is reasonably
related to the prison's legitimate interests." Pierce, 526 F.3d
at 1216—17 (footnote omitted); see also Gates v. Rowland, 39 F.3d
1439, 1446 (9th Cir. 1994).[3]

261. The Ninth Circuit clearly set out the framework for the Court's
inquiry:

_____

[3]The Ninth Circuit in this case noted that some uncertainty
surrounds whether Gates remains good law in light of the Supreme
Court's decision in Johnson v. California, 543 U.S. 499 (2005), in
which the Court held that strict scrutiny, not the Turner test,
applies to racial classifications in the prison context.  Pierce, 526
F.3d at 1217 n.29.  The Ninth Circuit, however, did not reach the
question because reversal was warranted under the more lenient Turner
test.  This Court also does not reach the question here for the same
reason: the County has not satisfied the more lenient Turner test.

1          In ADA cases, the plaintiff bears the burden of establishing the elements of the prima facie case, including — if needed — "the existence of a reasonable accommodation" that would enable him to participate in the program, service, or activity at issue.  The public entity may then rebut this by showing that the requested accommodation would require a fundamental alteration or would produce an undue burden. . . . [D]etermining whether a modification or accommodation is reasonable always requires a fact-specific, context-specific inquiry.  This analysis permits a court to consider, with deference to the expert views of facility administrators, a detention or correctional facility's legitimate interests (namely, in "maintaining security and order" and "operating [an] institution in a manageable fashion,") when determining whether a given accommodation is reasonable.

11    _Id._ at 1217 (internal citations omitted; brackets in original).

12    **D.   Prison Litigation Reform Act**

13  262. The Prison Litigation Reform Act ("PLRA") provides: "Prospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs. The court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right."  18 U.S.C. § 3626(a)(1)(A).  Moreover, "[t]he court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief."  _Id._

25  263. Under the PLRA, "'[t]he scope of injunctive relief is dictated by the extent of the violation established.'"  _Armstrong_, 622 F.3d at 1072 (citation omitted).  If only isolated violations have occurred for a narrow range of plaintiffs, then injunctive relief

must be narrow; however, if the violations are system-wide, even though affecting only a small number of plaintiffs, then relief can be system-wide as well.  Id. at 1072—73.

264. In making the required findings under the PLRA, the Court need not provide an explicit, provision-by-provision justification for the relief ordered; instead, the Court must find that "the set of reforms being ordered . . . corrects the violations of prisoners' rights with the minimal impact possible on defendants' discretion over their policies and procedures."  Id. at 1070.

265. Thus, the Court satisfies the PLRA by providing a clear explanation of the "factual circumstances underlying an order and its understanding of the relevant law as applied to the facts," and then providing an "overall statement" that the "need-narrowness-intrusiveness standard has been met[.]"  Id. at 1071.

266. With regard to intrusiveness, the Court must take care not to "'enmesh [itself] in the minutiae of prison operations,' beyond what is necessary to vindicate plaintiffs' federal rights," and the Court satisfies the intrusiveness prohibition by ordering a defendant to "draft and promulgate a plan," which leaves to the defendant discretion to determine the details of how to deliver the relief ordered.  Id. (brackets in original).

267. Under the PLRA, then, "the question is not whether the relief the court ordered to vindicate [federal] rights is expensive, or difficult to achieve, but whether the same vindication of federal rights could have been achieved with less involvement by the court in directing the details of defendants' operations."  Id.

268. Consistent with the PLRA's mandate, the Court may exercise its inherent authority to appoint a special monitor to oversee

compliance with Court Orders intended to remedy statutory violations in the prison context.  See Benjamin v. Fraser, 343 F.3d 35, 44—47 (2d Cir. 2003), abrogated in other part by Caiozzo v. Koreman, 581 F.3d 63, 70 (2d Cir. 2009); cf. Plata v. Schwarzenegger, 603 F.3d 1088, 1095—96 (9th Cir. 2010) (citing Benjamin and approving of use of receiver under the PLRA to remedy constitutional violations in state prisons).

**E.    Physical Barriers**

269. Module O at Theo Lacy is considered a "new" facility under ADA regulations, so it must be "readily accessible to and usable by individuals with disabilities."  See 28 C.F.R. § 35.151(a). (Docket No. 731 at 16.)

270. Because the MCJ, the IRC, the WCJ, and Musick were built before January 26, 1992, and were not substantially altered after that date, the more flexible and less stringent standard of 28 C.F.R. § 35.150 applies.  See Title II Preamble, Pt. 35, App. A.

271. ADAAG requires that two percent of all cells within a correctional facility should be accessible and that, where there are specialized units, such as administrative segregation, protective custody, isolation, etc., at least one of each type of cell should be accessible.  36 C.F.R. Pt. 1191 (ADAAG § 12.4.1). (Trial Tr. 84:1—22.)  Additionally, ADAAG requires that five percent of counters for receiving and booking detainees and inmates be made accessible.  (Trial Tr. 194:7—195:13; Ex. 138 (CalDAG Guidelines) Ch. 6, § 58 at 333.)

272. Orange County's prior ADA transition plan from 2000 agreed that the County was required to make at least two percent of the total number of cells available fully accessible to individuals with

1   disabilities, although that was never implemented.  (Trial Tr.

2   424:8—425:5; Trial Ex. 6 at 30.)

3   273. UFAS requires that five percent of all cells in jails and

4   correctional facilities should be accessible.  UFAS § 4.1.4(9).

5   (Trial Tr. 357:1—15, 433:1—22.)

6   **F.   Programs, Services, and Activities**

7   274. "The ADA does not require perfect parity among programs offered

8   by various facilities that are operated by the same umbrella

9   institution.  But an inmate cannot be categorically excluded from

10   a beneficial prison program based on his or her disability

11   alone." Pierce, 526 F.3d at 1221.  "[T]he County may not shunt

12   the disabled into facilities where there is no possibility of

13   access to those programs." Id.

14   275. In discussing the scope of programs, activities, and services,

15   the Ninth Circuit quoted the Supreme Court's explanation of the

16   issue: "Modern prisons provide inmates with many recreational

17   'activities,' medical 'services,' and educational and vocational

18   'programs,' all of which at least theoretically 'benefit' the

19   prisoners (and any of which disabled prisoners could be 'excluded

20   from participation in')." Id. at 1221 (quoting Penn. Dept. of

21   Corrections v. Yeskey, 524 U.S. 206, 210 (1998)).

22   276. Moreover, the Ninth Circuit identified the types of programs,

23   activities, and services offered at Theo Lacy and Musick, but not

24   at the MCJ and the WCJ, such as vocational opportunities for

25   "agriculture, woodworking, and welding," opportunities to work on

26   "off-site or community work projects," and recreational

27   opportunities involving "a softball field, volleyball courts,

28   pool tables, and other indoor and outdoor facilities." Id.

64

277. The Ninth Circuit left open the possibility that the Court could order redistribution of services and programs, as well as "other appropriate remedies" in addressing any violations, which may include bussing disabled inmates to other facilities to remedy unequal access to programs, services, and activities. Id. at 1222.

**G.    Notice of Rights and Grievance Procedures**

278. "A public entity shall make available to applicants, participants, beneficiaries, and other interested persons information regarding the provisions of this part and its applicability to the services, programs, or activities of the public entity, and make such information available to them in such manner as the head of the entity finds necessary to apprise such persons of the protections against discrimination assured them by the Act and this part." 28 C.F.R. § 35.106.

279. "A public entity that employs 50 or more persons shall designate at least one employee to coordinate its efforts to comply with and carry out its responsibilities under this part, including any investigation of any complaint communicated to it alleging its noncompliance with this part or alleging any actions that would be prohibited by this part.  The public entity shall make available to all interested individuals the name, office address, and telephone number of the employee or employees designated pursuant to this paragraph." 28 C.F.R. § 35.107(a).

280. "A public entity that employees 50 or more persons shall adopt and publish grievance procedures providing for prompt and equitable resolution of complaints alleging any action that would be prohibited by this part." 28 C.F.R. § 107(b).

# IV.   ULTIMATE FINDINGS OF FACT

This case began almost ten years ago, has been the subject of two bench trials, and has been appealed to the Ninth Circuit and reversed and remanded for further fact-finding.  During this time, the County has done very little to remedy any of the physical barriers or unequal provision of programs, services, and activities pointed out by Plaintiffs, even after the Ninth Circuit found in 2008 that the existing conditions violated the ADA.  As the Court discusses below, Plaintiffs have shown quite plainly that mobility- and dexterity-impaired detainees are, by reason of their disability, subject to physical barriers to accessibility of many jail facilities, excluded from participation in and denied the benefits of the services, programs, or activities offered by the County, and, until the eve of the last day of the current trial, denied notice of their rights and grievance procedures under the ADA.  Moreover, with limited exceptions, the County has failed to demonstrate that Plaintiffs' proposed accommodations would result in the fundamental alteration in the nature of any service, program, or activity, or result in undue financial and administrative burdens.  Pierce, 526 F.3d at 1215.  Similarly, the County has not shown that the current impermissible conditions may be maintained because they are reasonably related to legitimate penological objectives.  Id. at 1216.

## A.   Physical Barriers

Plaintiffs have carried their burden to show that many physical barriers exist at each jail facility housing mobility- and dexterity-impaired detainees, and that the expense of remedying these barriers is reasonable.  In Module O in the MCJ, for example, the showers, toilets, and sinks in Wards C and D and Sheltered Living are

inaccessible and could readily be made accessible at reasonable cost.
It is not a reasonable alternative to physical modifications in the
MCJ to require other inmates, officers, or medical staff to assist
disabled detainees and inmates to transfer into and out of the shower
and on and off the toilet.  The County must also bring a sufficient
number of cells into ADA compliance in Module O of the MCJ to meet the
two-percent guideline in ADAAG.  With the exception of the bathroom,
the rooftop exercise area also contains physical barriers to
accessibility that could be remedied at reasonable cost, such as
adding a safety rim on the ramp and a railing on one side of the ramp,
and lowering a phone.  However, the County has demonstrated that no
alterations are necessary at this time for the bathroom located up a
flight of stairs because it is currently closed to all inmates, and,
even if reopened, it could not be physically altered at a reasonable
cost.  The proposed alternative of allowing disabled detainees and
inmates to use the accessible bathroom on the Administrative
Segregation side of the rooftop area would also be administratively
impractical and is not required.

In the IRC, while one cell for males and one cell for females in
the booking loop have been made accessible, the County must make
accessible at least one of each other type of cell, such as court
transfer cells and pending release cells.  This can be done at a
reasonable cost.  Likewise, counters in the booking loop must be
modified to make five percent of them accessible pursuant to ADAAG
guidelines, which also can be done at a reasonable cost.

Sectors 13 and 14 and the recreation area in Module K of the IRC
contain numerous physical barriers, such as inaccessible second-floor
cells and rooms (including a visiting area), and inaccessible phones,

tables, showers, and toilets.  The phones, tables, showers, and
toilets can be readily altered to be made accessible at reasonable
cost.  As in the MCJ, it is not a reasonable accommodation for other
inmates, officers, or medical staff to assist disabled female
detainees and inmates with showering and using the toilet.

Nor is it reasonable to accommodate disabled female detainees by
walking them 900 yards, or nine football fields, to the WCJ so they
might be able to use an accessible shower there or have a contact
visit because they cannot ascend the stairs to the visiting area in
the IRC.  Moreover, the County would have to make ten cells in Module
K to comply with the ADAAG two-percent guideline.

Module L at the IRC, which provides round-the-clock mental health
services to mentally ill male inmates, contains one accessible cell
out of twenty-four, but barriers still exist in the dayroom area's
shower, bathroom, phone, and tables, the recreation area's toilet and
sink, and the visiting area on the second floor, which are identical
to Module K.  The County could make these areas accessible at a
reasonable cost.

Although not currently open, if the WCJ is opened in the future,
the County will have to remedy the numerous physical barriers to
accessibility in the Infirmary and Sheltered Living, which could be
done at reasonable expense.  The rooftop recreation area at the WCJ
also has inaccessible phones and restrooms, which could be made
accessible at reasonable cost.

As for Module O at Theo Lacy, the County violates the ADA by
prohibiting wheelchair-bound detainees from being housed there with
other disabled detainees and inmates based on its allegations that
there is inadequate medical staff and the elevator in the facility

often breaks down.  Moreover, the shower, tables, and phone in Sector
37 of Module O at Theo Lacy are inaccessible and could be made
accessible at reasonable cost.  The showers in Sector 41 are
inaccessible and could be made accessible at reasonable expense.
Also, two percent of the cells in Sector 41 must be made accessible
pursuant to ADAAG guidelines.  The evidence did not demonstrate that
accessible grab bars in these areas would pose a suicide risk or that
a 36-inch wide doorway poses a security risk that would excuse
modifications.  Although barriers exist in the Barracks areas of Theo
Lacy, the Court will not order disabled detainees and inmates to be
"mainstreamed," so the Barracks do not need to be made accessible at
this time.

With regard to Musick, mobility- and dexterity-impaired detainees
are not housed at Musick, primarily because there is no 24-hour
medical care at that facility.  The Court will not order disabled
detainees and inmates to be housed at Musick, given that it would be a
form of "mainstreaming."  However, because many of the areas of Musick
are accessible to disabled detainees and inmates, such as the
visitor's center, the medical unit, and the building where many of the
shop classes are held, disabled detainees and inmates could be brought
to Musick to take advantage of programs, services, and activities
offered there, as discussed below.

B.   **Programs, Services, and Activities**

Plaintiffs have carried their burden to show that certain
categories of programs, services, and activities, "when viewed in
their entirety," are not "similarly available to disabled detainees
who, with or without reasonable accommodations, meet the essential
eligibility requirements to participate."  <u>Pierce</u>, 526 F.3d at 1222.

As the Ninth Circuit found two years ago, disabled detainees continue
to be "shunted" into facilities such as the MCJ, the IRC, and Module O
of Theo Lacy, where there is little opportunity to participate in
vocational and recreation opportunities available to non-disabled
detainees and inmates at Theo Lacy and Musick.  Id. at 1221.

In accordance with the Ninth Circuit's mandate that programs,
services, and activities need not be in "perfect parity" across
facilities, the Court must "look at the offerings as a whole and in
their entirety" to determine whether equal access exists.  Id. at
1222.  Upon careful review of the evidence, the Court finds that
disabled male detainees in the MCJ do not have equal access to
vocational programs and recreational opportunities offered to non-
disabled detainees and inmates at Musick and Theo Lacy.  Mobility- and
dexterity-impaired female detainees and inmates at the IRC also do not
have equal access to vocational classes or recreational opportunities
offered to non-disabled female detainees and inmates at Musick.
Finally, disabled detainees housed in Module O of Theo Lacy do not
have equal access to any classes, programs, or recreational
opportunities offered to non-disabled detainees and inmates.

Perhaps the most egregious example of the lack of equality for
disabled detainees exists at Module O of Theo Lacy.  The only classes
offered to disabled detainees housed there are religious services.
Detainees are not permitted to use the Green Sector for recreation or
the Inmate Programming Building for classes and programs, even though
those areas are accessible and right outside Module O.  Instead,
disabled detainees and inmates are permitted only to use a tiny
classroom that lacks desks, computers, or other equipment, and a small
interior blacktop area equipped with only a basketball hoop.  The

70

County offered no justification for this second-class arrangement, and indeed, the County's expert admitted that there was no reason not to allow disabled detainees in Module O to use the adjacent Inmate Programming Building or outside Green Sector.  This failure to offer even minimally equivalent programs, services, and activities to disabled detainees in Module O of Theo Lacy violates the ADA.

Mobility-impaired female detainees and inmates in Module K of the IRC are in a similar predicament if they cannot ascend the stairs in that facility.  The classrooms in Module K are located up a flight of stairs, so wheelchair-bound detainees must request that a class be given in the open area on the first floor.  Plaintiffs raise the quite rational concern that detainees, whether disabled or not, would not feel comfortable requesting or attending certain classes, such as narcotics anonymous, AIDS education, domestic violence, and substance abuse under these circumstances.  Thus, the practical effect is to withhold these classes from wheelchair-bound and other mobility-impaired female detainees in Module K of the IRC.

Even those disabled detainees who can manage the IRC stairs still do not have access to the range of educational, vocational, and rehabilitative classes offered at Musick, such as GED classes, Government, ESL, positive parenting, workforce preparation, food service, health classes, MOPS (Mothers of Pre Schoolers), stained-glass making, or sewing classes.  Nor are they offered the "shop"-type classes available at Musick.  The evidence demonstrates that at least some limited form of some these classes could be offered in the chapel room in Module K, which is located on the same floor as the housing cells.  That is not to say that the County should limit or eliminate the use of the chapel for religious services: detainees and inmates

should not be deprived of the opportunity to attend religious services
in order to attend other classes and programs held in the chapel.
Nevertheless, the evidence demonstrates that at least some vocational
and other classes, such as sewing and stained-glass making, could be
offered in the chapel in a limited form without compromising
detainees' and inmates' opportunity to attend religious services there
as well.

Moreover, the recreational opportunities for disabled female
detainees in Module K are also far more limited than those at Musick,
consisting of a room with a basketball hoop and little else, as
compared to the outdoor recreational areas on the grounds of Musick
for baseball, volleyball, basketball, horseshoes, and picnics.

As the "grimmest and most dismal" of all jail facilities, the MCJ
offers little in the way of recreation to disabled detainees and
inmates, especially when compared to the Green Sector of Theo Lacy and
the outdoor area at Musick.  MCJ detainees are allowed to use only the
dayrooms with few activities and are offered little chance for outdoor
exercise.  Of the vocational and educational classes offered at the
MCJ, none fall into the "shop" category like those offered at Musick.
The County failed to demonstrate that smaller versions of some of
these could not be offered at the MCJ and the evidence demonstrated
that other classes, such as stained-glass making and food service,
could in fact be held at the MCJ with some alteration.

Plaintiffs have also proved that, to take advantage of shop-type
vocational classes that cannot be provided at the MCJ or the IRC and
to take advantage of outdoor recreational opportunities unavailable at
the MCJ or the IRC, the County can be reasonably required to arrange
transportation for disabled detainees to Musick and Theo Lacy within

1  reasonable parameters.  There is simply no other way to ensure that

2  disabled detainees in the MCJ and the IRC are provided even roughly

3  equivalent recreation and shop-type opportunities at the MCJ or the

4  IRC, given the physical limitations of those facilities.

5       C.  **Fundamental Alterations and Undue Burden**

6       As already noted, the County offered little specific evidence of

7  the fiscal or other impact of altering the physical facilities in the

8  jail system or providing programs, services, and activities in ways to

9  accommodate mobility- and dexterity-impaired detainees.  Thus, even

10 deferring to the "expert views of facility administrators," Pierce,

11 526 F.3d at 1217, the County has failed to carry its burden to

12 demonstrate that requested accommodations "would require a fundamental

13 alteration or would produce an undue burden," id., or that the current

14 conditions are "reasonably related to the prison's legitimate

15 interests," id. at 1216.

16      Specifically, while the current budget shortfall for the County

17 is undoubtedly serious, the County failed to offer any specific

18 budgetary evidence that would justify maintaining the facilities in

19 their current state or keeping the programs, services, and activities

20 at their status quo.  Indeed, on the issue of programs, services, and

21 activities, the evidence demonstrated that many of the programs

22 offered to inmates are paid for by inmates through the Inmate Welfare

23 Fund, are provided by Santiago Community College at little to no cost

24 to the County, or are provided by volunteers, undermining the County's

25 claims of fiscal impact sufficient to excuse compliance with the ADA.

26      Other specific justifications for certain policies also fell

27 short of justifying the County's ADA violations.  For example, there

28 was little evidence that detainees with mobility-assistive devices

such as wheelchairs, walkers, and crutches present a security risk
that would justify their exclusion from classes and programs, as there
are no jail policies prohibiting inmates and detainees with these
devices from taking classes with non-disabled inmates and detainees.
Moreover, there was no evidence that grab bars pose a hanging hazard,
as contended by the County.  And the County's policy of excluding
wheelchair-bound detainees from Module O of Theo Lacy cannot be
justified by the proffered reasons for it, namely, that the elevator
in Module O breaks down frequently and that there are not enough
medical personnel to care for wheelchair-bound detainees.  The
evidence offered by Plaintiffs fatally undermined these
justifications.

### D.   ADA Notice of Rights and Grievance Procedure

The evidence demonstrated and the County largely conceded that,
before 2009, the jail system provided inadequate to non-existent
notice of rights and grievance procedures under the ADA.  The County
has since taken steps to ameliorate these violations.  Plaintiffs
agree that the County's addition of ADA rights to the prison rules
posted in each housing area sufficiently notifies disabled detainees
and inmates of their ADA rights.  Plaintiffs also agree that the
County's revised grievance procedure to allow detainees to submit a
written complaint on the current grievance form, which must be given
to the newly designated ADA compliance officer in each facility,
satisfies the ADA.

However, the County still does not ensure that the notice of ADA
rights is posted at a height readable by all disabled detainees.  Nor
does it provide training for ADA compliance officers in the different
facilities.  And the County does not currently have an adequate system

1  to track ADA grievances.  That system should contain, at a minimum, a

2  centralized electronic or hard-copy file with copies of grievances,

3  investigations, findings, responses, and appeals.  These additional

4  procedures are necessary to ensure the County is properly handling and

5  responding to detainee and inmate complaints implicating the ADA.

6  **V.   INJUNCTIVE RELIEF**

7       The extensive record in this case demonstrates widespread

8  violations of the ADA that can be remedied only by widespread

9  injunctive relief.  Armstrong, 622 F.3d at 1072—73.  The Court finds

10 that the injunctive relief to be ordered below "corrects the

11 violations of prisoners' rights with the minimal impact possible on

12 defendants' discretion over their policies and procedures."  Id. at

13 1070.  It therefore meets the "need-narrowness-intrusiveness" test

14 under the PLRA in that it is "narrowly drawn, extends no further than

15 necessary to correct the violation of the Federal right, and is the

16 least intrusive means necessary to correct the violation of the

17 Federal right."  18 U.S.C. § 3626(a)(1)(A).

18      Plaintiffs advocate for a barrier-by-barrier and program-by-

19 program injunction in which the Court orders each violation identified

20 above to be corrected.  The Court rejects that approach in part.

21 While the Court is convinced that the County will do nothing to make

22 its facilities and programs accessible if the Court does not order it

23 to do so, the least intrusive means to compel the County to remedy the

24 physical barriers and disparate provision of programs, services, and

25 activities to disabled detainees is to allow the County to draft a

26 proposed plan that will address and correct each and every physical

27 barrier identified in this Order and that will ensure that disabled

28 detainees are provided with equal access to programs, services, and

1  activities as discussed herein.   See Armstrong, 622 F.3d at 1071

2  ("Allowing defendants to develop policies and procedures to meet the

3  ADA's requirements is precisely the type of process that the Supreme

4  Court has indicated is appropriate for devising a suitable remedial

5  plan in a prison litigation case."); Benjamin, 343 F.3d at 52—53

6  ("After finding current and ongoing violations, the district court

7  prudently solicited agreement from the parties on appropriate remedies

8  and deadlines for compliance. . . .  the court recognized that, due to

9  its superior institutional knowledge, the City's participation in the

10 development of all aspects of the remedial orders was invaluable.").

11 Should this plan fall short in any respect, Plaintiffs will have an

12 opportunity to object and the Court will resolve those disputes.   Once

13 finalized, the Court will approve the plan and that will become the

14 injunctive relief ordered.

15      In drafting this plan, the County should incorporate the specific

16 relief outlined below to ensure violations are addressed and

17 corrected:

18      **Theo Lacy**

19 1.  As new, post-1991 construction, Module O of Theo Lacy must comply

20     with ADAAG, which requires that at least two percent of each type

21     of cell in that facility be made fully accessible.   Those cells

22     falling within the two percent rule are: one-person cells, two-

23     person cells, four-person cells, and isolation or other

24     specialized cells.   The open ward area in Sector 37 must also be

25     made fully accessible.

26 2.  All recreation or dayroom areas utilized by disabled detainees

27     and inmates in Module O of Theo Lacy must also be modified so

28     that they are fully accessible, including modifying the shower in

Module O, Sector 37, the toilet and sink associated with the recreation area, and the toilet, sink and shower in each dayroom associated with Module O.

3.  The County may no longer exclude wheelchair-bound detainees from being housed at Module O of Theo Lacy, provided the detainee can use the toilet, sink, and shower without medical assistance.

4.  The County may not bar disabled detainees housed in Module O of Theo Lacy from either the Inmate Programming Building or the Green Sector.  This does not require the County to allow disabled and non-disabled detainees and inmates to take classes or recreate together, but it does require the County to provide disabled detainees with equal access to the Inmate Programming Building and to provide time for recreation in the Green Sector for disabled detainees in Module O.

**The MCJ**

5.  At the MCJ, the County must ensure that the Inmate Programming staff regularly contact disabled detainees in Module O to ensure that they have access to the classes and programs offered there.

6.  The County must offer disabled detainees in Module O at the MCJ the opportunity to take vocational classes offered at Musick or Theo Lacy that cannot be offered at the MCJ due to limited physical space, which may require transporting detainees to Musick or Theo Lacy.

7.  The County must also offer disabled detainees in Module O at the MCJ the opportunity to engage in the types of outdoor recreation available at Musick or Theo Lacy but not offered at the MCJ due to limited physical space in the dayroom or on the roof, which may require transporting them to Musick or Theo Lacy.

8. The County must offer disabled detainees in Module O at the MCJ the opportunity to have contact visits with their families at the visiting center at Musick, provided they meet the security classification for such visits, which may require transporting the detainees to Musick.

9. The County must modify and/or repair showers, toilets, and sinks in Wards C and D to make them accessible to the full range of mobility- and dexterity-impaired detainees.

10. The County must remove all remaining barriers to accessibility in the dayroom of the Sheltered Living area, including modifying the shower so it is accessible.

11. As to the three Sheltered Living cells which have been made partially accessible, the County must complete that process by installing an ADA-compliant sink and extending the grab bar by the toilet in each cell.

12. With respect to the rooftop recreation area, the County must install a safety rim on the ramp and a railing on the right side of the ramp; it must also lower one of phones so that it is fully accessible to a detainee in a wheelchair.

**The IRC**

13. For the IRC, the County must modify Sectors 13 and 14 of Module K to make at least three of those cells fully accessible with ADA-compliant sinks, beds, and toilets.  The County may not require disabled detainees to use portable commodes and shower stools or require detainees to request transport to the WCJ for showers.

14. The County must remove structural barriers from the dayrooms used by disabled detainees in Sector 13 and 14 through the installation of accessible toilets, sinks, showers, and phones in

1   those rooms.

2   15.  The County must also modify the chapel area so that it is able to

3        accommodate classroom-style desks, computers, sewing machines,

4        and other equipment, although the Court will permit the County to

5        propose the best and most efficient way to do that without

6        permanently altering the chapel area and preserving the ability

7        to provide religious services there.  In any event, the County

8        may not require disabled detainees to take classes in full view

9        of the guard station, in lieu of a private classroom setting

10       provided to non-disabled detainees and inmates.

11  16.  The County must modify the sink and toilet in the recreation area

12       attached to Module K at the IRC so that they are accessible.

13  17.  The County must offer disabled female detainees in Module K at

14       the IRC the opportunity to take any vocational classes offered at

15       Musick that cannot be offered at the IRC due to limited physical

16       space in the chapel room, which may require transporting them to

17       Musick for such classes.

18  18.  The County must offer disabled detainees in Module K at the IRC

19       the opportunity to engage in the types of outdoor recreation only

20       available at Musick but not offered at the IRC due to limited

21       physical space in the recreation area attached to Module K, which

22       may require transporting them to Musick for recreation.

23  19.  The County must offer disabled detainees in Module K at the IRC

24       the opportunity to have contact visits with their families at the

25       visiting center at Musick, provided they meet the security

26       classification for such visits, which may require transporting

27       them to Musick for that purpose.

28  20.  The dayroom's shower, bathroom, phone, and tables, the recreation

area's toilet and sink, and the visiting area on the second floor
of Module L must be made accessible in the same way as those
areas in Module K.   The County is not excused from making these
physical modifications because of any hanging or suicide risks to
mentally ill inmates in Module L.

21. The County must make fully accessible one of the court transfer
cells and one of the release cells on the male side of the IRC
booking loop, and the same on the female side of the loop.

22. The County must lower one of each type of counter used by jail
staff and medical personnel as part of the booking process so
that they are at the appropriate height for individuals in
wheelchairs or with other mobility impairments.

**The WCJ**

23. In the event that the County elects to reopen the WCJ and house
any women with mobility or dexterity impairments in the prior
Infirmary area in the WCJ, that area must be made accessible by
installing an accessible toilet, sink, and hot water dispenser in
the dayroom, by modifying the "handicap" shower to make it fully
accessible, and by modifying individuals cells so that a
sufficient number are fully accessible.

24. Similarly, if any portion of the WCJ other than the Infirmary is
reopened, that housing area must have at least three ADA-
compliant cells and any associated dayroom and shower must be
modified to be fully accessible to detainees with mobility or
dexterity impairments.

25. If women with mobility or dexterity impairments are again housed
in the WCJ, the County must also modify the restroom and sinks on
the rooftop recreation area so that there is at least one

1    accessible toilet and one accessible sink.

2    **Musick**

3  26.  If any Musick classrooms need to be further modified to be fully

4      accessible in order to offer equal access to programs, services,

5      and activities at Musick that cannot be offered at the MCJ and/or

6      the IRC, those modifications must be made in order to accommodate

7      disabled detainees bussed there.

8    **Records of Class Offerings and Attendance**

9  27.  The County shall maintain records for a period of two years

10      reflecting the class offerings and attendance of disabled

11      detainees at each jail facility.

12    **Notice and Grievance Procedure**

13  28.  The County's current notice of rights under the ADA is sufficient

14      to inform disabled detainees of their rights and the grievance

15      procedure.

16  29.  Similarly, the County's new grievance procedure, which allows

17      detainees to submit a written complaint on the current grievance

18      form to the newly designated ADA compliance officer in each

19      facility, is sufficient under the ADA to provide a mechanism by

20      which disabled detainees can submit a written complaint if they

21      believe their rights under the ADA have been violated.

22  30.  In order to ensure that the notice is provided to all detainees

23      with disabilities, the County must post the notice so it is

24      readable by all detainees with disabilities, including those in

25      wheelchairs or with other impairments.

26  31.  The County must provide ADA compliance officers in the different

27      facilities with a minimum of six hours of training on the ADA,

28      its application in jail settings, and their responsibilities to

1    process and respond to requests for accommodation and/or

2    complaints of denial of access to programs and services.

3  32.   The County must also institute an effective system of maintaining

4    and tracking all grievances raising claims under the ADA, but the

5    County may choose how it implements that directive.

6    Plaintiffs request that the Court order a special monitor to

7  oversee and report compliance with any injunction.  The Court has the

8  authority to do so.  See Benjamin, 343 F.3d at 44—47; cf. Plata, 603

9  F.3d at 1095—96.  Nevertheless, the Court defers ruling on the

10 necessity for a monitor until it considers the County's remedial plan.

11 **VI.   CONCLUSION**

12    Plaintiffs have carried their burden to establish that the County

13 has violated the ADA in numerous respects in the Orange County Jail

14 System and that reasonable accommodations exist to remedy those

15 violations.  The Court ORDERS the County to create a plan to remedy

16 those violations consistent with the Court's Opinion.  That plan must

17 be submitted to the Court **within 45 days of the date of this Order.**

18 Plaintiffs may respond to that plan **within 21 days after the date of**

19 **its filing.**  The Court will hold a hearing to discuss the plan on

20 **Monday, April 4, 2011 at 10:00 a.m.**

21    IT IS SO ORDERED.

22    DATED: January 7, 2011            _____

23                                       AUDREY B. COLLINS

24                                       CHIEF UNITED STATES DISTRICT JUDGE

25

26

27

28